UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LOWRANZO HACKETT, et. al. | No. ___1:19-cv-11313___ |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, a Delaware Limited Liability Company, ROBERT BOSCH GMBH, a corporation organized under the laws of Germany, and ROBERT BOSCH LLC, a Delaware Limited Liability Company, | |
| Defendants. | |

### ORIGINAL COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs listed and set forth herein below file this Original Complaint and Jury Trial Demand complaining of Defendants General Motors LLC, Robert Bosch GmbH, and Robert Bosch LLC, and for cause of action would show:

### INTRODUCTION

1.     This is what General Motors ("GM") promised when selling its popular Silverado and Sierra HD Vehicles—that its Duramax engines turned "heavy diesel fuel into a fine mist," delivering "low emissions" that were a "whopping reduction" compared to the prior model and at

the same time produced a vehicle with "great power." GM claimed its engineers had accomplished a "remarkable reduction of diesel emissions."

2.     As explained in detail below, this is not what GM delivered in the estimated 705,000 or more 2011-2016 Silverado and Sierra 2500 and 3500 diesels on the road. In contrast to GM's promises, scientifically valid emissions testing conducted by engineering experts who were retained by Class Counsel in *In re Duramax Diesel Litigation*, Case No. 2:17-cv-11661 (E.D. Mich.) (the "Duramax Class Action") has revealed that the Silverado and Sierra 2500 and 3500 models emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the Environmental Protection Agency's maximum standards, and (v) the levels set for the vehicles to obtain a certificate of compliance that allows them to be sold in the United States. Further, the vehicles' promised power, fuel economy, and efficiency is obtained only by turning off or turning down emissions controls when the software in these vehicles senses they are not in an emissions testing environment.

3.     In the last two years, there have been major scandals involving diesel vehicles made by Volkswagen, Audi, Porsche, Mercedes, and FCA. Volkswagen pled guilty to criminal violations of the Clean Air Act, Mercedes is under investigation by the Department of Justice, and FCA has been sued by the EPA for violating the Clean Air Act for improper emissions in thousands of 2014-2016 Dodge Ram 1500 EcoDiesels and 2014-2016 Jeep Grand Cherokee EcoDiesels. The diesel vehicles made by these manufacturers evade emissions standards with the help of certain software that turns off or down emissions controls when the vehicles sense they are not in a test environment.

4.     Testing conducted by experts retained by Class Counsel in the Duramax Class Action indicates that GM is no different. Its top selling Silverado and Sierra 2500HD and 3500HD vehicles emit far more pollution on the road than in the emission certification testing environment. These vehicles exceed federal and state emission standards and employ at least three different "defeat devices" to turn down the emissions controls when the vehicle senses that it is not in the certification test cycle. A defeat device means an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.

5.     <u>GM Defeat Device No. 1</u> reduces or derates the emissions system when temperatures are above the emissions certification test range (86°F). <u>GM Defeat Device No. 2</u> operates to reduce emissions control when temperatures are below the emissions certification low temperature range (68°F). Testing reveals that at temperatures below 68°F (the lower limit of the certification test temperature), stop and go emissions are 2.1 times the emissions standard at 428 mg/mile (the standard is 200 mg/mile). At temperatures above 86°F, stop and go emissions are an average of 2.4 times the standard with some emissions as high as 5.8 times the standard. Based on temperatures in the top 30 metropolitan areas, these vehicles are operating with the emissions systems derated a material amount of their vehicle miles travelled. But the emission scheme is a step more nefarious: enter <u>GM Defeat Device No. 3</u>, which reduces the level of emissions controls after 200-500 seconds of steady speed operation in all temperature windows, causing emissions to increase on average of a factor of 4.5. Based on a study of temperatures in 30 major metropolitan areas as well as the demographics of Silverado and Sierra sales, experts retained by Class Counsel in the Duramax Class Action estimate that due to just the temperature-triggered defeat devices, the

vehicles operate at 65-70% of their miles driven with emissions that are 2.1 to 5.8 times the standard.

6.     Increased sales and thus increased profits drove GM to use at least these three defeat devices in its Duramax diesel engines. By reversing the traditional order of the exhaust treatment components and putting the Selective Catalytic Reduction (SCR) in front of the Diesel Particulate Filter (DPF), GM could obtain and market higher power and fuel efficiency from its engines while still passing the cold-start emissions certification tests. This made GM's trucks more appealing and competitive in the marketplace, driving up sales and profits. But the reordering would have also drastically increased the need to employ Active Regeneration (burning off collected soot at a high temperature) and other power- and efficiency-sapping exhaust treatment measures, reversing the very advantage gained. GM's solution, with the participation of defendants Robert Bosch GmbH and Robert Bosch LLC, was to install defeat devices to purposefully reduce SCR dosing, increase NOx emissions, and thus decrease Active Regeneration. The defeat devices allowed GM to have its cake and it eat too. It could gain the advantage of hot exhaust going into the SCR system needed to pass cold-start tests, while avoiding the fuel- and power-robbing Active Regeneration procedure that the    DPF filter requires when the SCR treatment comes first. GM turned a blind eye to the twofold to fivefold increase in deadly NOx emissions its scheme caused—all to drive up its sales and profits.

7.     Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions. Compared to gasoline engines, diesel engines generally produce greater torque, low-end power, better drivability, and much higher fuel efficiency. But these benefits come at the cost of much dirtier and more harmful emissions.

8.      One by-product of diesel combustion is NOx, which generally describes several compounds comprised of nitrogen and oxygen atoms. These compounds are formed in the cylinder of the engine during the high temperature combustion process. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects. The United States Government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect United States citizens from these pollutants and certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these U.S. laws and must adhere to EPA rules and regulations. This case is not based on these laws but on deception aimed at consumers.

9.      Seeing a major opportunity for growth, almost all of the major automobile manufacturers rushed to develop "clean diesel" and promoted new diesel vehicles as environmentally friendly and clean. Volkswagen, Mercedes, GM, FCA, and other manufacturers began selling diesel cars and trucks as more powerful, yet also as an environmentally friendly alternative to gasoline vehicles. And the marketing worked, as over a million diesel vehicles were purchased between 2007 and 2016 in the United States and over ten million in Europe.

10.     The green bubble with respect to diesel vehicles popped on September 18, 2015, when the EPA issued a Notice of Violation of the Clean Air Act (the "First NOV") to Volkswagen Group of America, Audi AG, and Volkswagen America for installing illegal "defeat devices" in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines. A defeat device, as defined by the EPA, is any apparatus that unduly reduces the effectiveness of emissions control systems under conditions a vehicle may reasonably be expected to experience. The EPA

found that the Volkswagen/Audi defeat device allowed the vehicles to pass emissions testing while in the real world these vehicles polluted far in excess of emissions standards. The California Air Resources Board also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

11.     On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emissions testing by U.S. regulators. Volkswagen pled guilty to criminal charges and settled civil class actions for over ten billion dollars.[1]

12.     Volkswagen wasn't alone—soon, government agencies began to reveal that many manufacturers both in the U.S. and in Europe had produced dozens of models that were exceeding emissions standards. On December 2, 2016, a class action was filed alleging that FCA's Dodge Ram and Jeep Grand Cherokee were exceeding emissions standards that a reasonable consumer would expect to be produced by "Eco" vehicles. On January 12, 2017, the EPA issued a Notice of Violation to FCA because it had cheated on its emissions certificates with respect to its Dodge Ram and Jeep Grand Cherokee vehicles, and on May 23, 2017, the United States filed a civil suit in the Eastern District of Michigan alleging violations of the Clean Air Act (E.D. Mich. No. 17-cv-11633).

13.     GM is no different. To appeal to environmentally conscious consumers, and to compete with its rival and top selling Ford trucks, and to comply with new emissions regulations effective in 2011, GM markets its Silverado 2500 and 3500 and Sierra 2500 and 3500 Duramax vehicles as having low emissions, high fuel economy, and powerful torque and towing capacity.

---

[1] See Exhibit 1 to the First Amended Complaint in *In re Duramax*, Case No. 1:17-cv-110661 (E.D. Mich.) (the "Duramax Class Complaint"), Dkt 18-2, Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Polluting*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

GM charges a premium of approximately $9,000 for diesel-equipped vehicles over comparable gas Silverados or Sierras.

14.     GM's representations are deceptive and false, and GM sold these vehicles while omitting information that would be material to a reasonable consumer, namely that GM has programmed its Silverado 2500 and 3500 and Sierra 2500 and 3500 Duramax vehicles to significantly reduce the effectiveness of the NOx reduction systems during real-world driving conditions.

15.     On-road testing by experts retained by Class Counsel in the Duramax Class Action has confirmed that GM's Silverado 2500 and 3500 and Sierra 2500 and 3500 vehicles with a Duramax engine produce NOx emissions that are not "reduced" or "low" but in fact exceed emission standards, and that GM has programmed the vehicles so that in a wide range of conditions, the emissions systems are powered down, producing NOx in excess of emissions standards. This testing indicates that GM and Bosch have programmed the software to detect a possible emission testing environment and to comply with emissions requirements in that circumstance, but to turn off the emissions controls when a testing environment is not detected. A reasonable consumer would not expect their Silverado or Sierra vehicle to spew unmitigated NOx in this fashion while driving in the city or on the highway, nor would a reasonable consumer expect that fuel economy was achieved in part by turning off or derating the emission systems, nor would a reasonable consumer expect that if the emissions were as promised the advertised fuel economy and performance could not be achieved.

16.     Plaintiffs allege that the following GM models powered by Duramax engines are affected by the unlawful, unfair, deceptive, and otherwise defective emission controls utilized by

GM: model year 2011-2016 GM Sierra 2500HD and 3500HD trucks and GM Silverado 2500HD and 3500HD trucks (the "Fraudulent Vehicles").

17.     In addition, GM markets the Fraudulent Vehicles as fuel efficient. Without manipulating its software to turn off the emissions controls, GM could not achieve the fuel economy and range it promises.

18.     GM did not previously disclose to Plaintiffs that in real-world driving conditions, the Fraudulent Vehicles can only achieve high fuel economy, power, and durability by reducing emissions controls in order to spew NOx into the air.

19.     GM never disclosed to consumers that the Fraudulent Vehicles may be "clean" diesels in very limited circumstances but are "dirty" diesels under most driving conditions. GM never disclosed to consumers that it programs its emissions systems to work only under certain conditions. GM never disclosed that it prioritizes engine power and profits over the environment. GM never disclosed that the Fraudulent Vehicles' emissions materially exceed the emissions from gasoline-powered vehicles, that the emissions exceed what a reasonable consumer would expect from a "low emissions" vehicle, and that the emissions materially exceed applicable emissions limits in real-world driving conditions.

20.     GM did not act alone. At the heart of the diesel scandal in the United States and Europe are Robert Bosch GmbH ("Bosch GmbH") and Robert Bosch LLC ("Bosch LLC") (sometimes referred together as "Bosch"). Bosch GmbH and Bosch LLC were active and knowing participants in the scheme to evade U.S. emissions requirements. Bosch GmbH and Bosch LLC developed, manufactured, and tested the electronic diesel control (EDC) that allowed GM to implement the defeat device. The Bosch EDC17 is a good enabler for manufacturers to employ "defeat devices" as it enables the software to detect conditions when emissions controls can be

derated—*i.e.*, conditions outside of the emissions test cycle. Almost all of the vehicles found or alleged to have been manipulating emissions in the United States (Mercedes, FCA, Volkswagen, Audi, Porsche, Chevy Cruze) use a Bosch EDC17 device.

## JURISDICTION

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962.  The Court also has diversity jurisdiction because Plaintiffs and Defendants reside in different states. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because some Plaintiffs are citizens of different states than any Defendant; there are more than 100 Plaintiffs; the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Plaintiffs reside across the United States. The citizenship of each party is described further below in the "Parties" section.

23.     This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district, and this State, and they intentionally availed themselves of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of GM vehicles in this State and District. At least in part because of Defendants' misconduct as alleged in this lawsuit, the Fraudulent Vehicles ended up on this state's roads and in dozens of franchise dealerships.

## VENUE

24.     Venue is proper in this Court under 28 U.S.C. § 1391 because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, GM's promotion, marketing, distribution, and sale of the Fraudulent Vehicles to Plaintiffs in this District. Defendant GM sells a substantial number of automobiles in this District, has dealerships located throughout this District, and the misconduct occurred in part in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants are subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and Defendants have agents located in this District.

## JURY TRIAL DEMAND

25.     Plaintiffs request a jury trial of this matter.

## PARTIES

**A.     Plaintiffs**

## INDIANA

26.     Plaintiff Lowranzo Hackett (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or

recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

27.     Plaintiffs Mike Hale and Ryan Hale (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2013 GMC 2500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal

driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

28.     Plaintiffs Larry Higgins and Mary Higgins (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2011 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

13

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

29.     Plaintiff Kyle Hines (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations

and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

30.     Plaintiff Paul Holden (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and

performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

31.     Plaintiff Tony Holden (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana and Plaintiff TWH Concrete, Inc. is a business in the State of Indiana, who acquired a 2015 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was

16

properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

32. Plaintiff Tony Holden (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly

disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

33.    Plaintiff Paul Homburg (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2016 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving

conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

34.     Plaintiffs Steven Hoover and Sheri Hoover (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2016 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

20

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

35.     Plaintiff Samuel Hull (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2014 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations

and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

36. Plaintiffs Thomas Jackson and Glenda Jackson (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2015 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel

economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

37.     Plaintiff Richard Kaehler (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2011 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised

fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

38.     Plaintiff Phillip Kitts (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly

disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

39. Plaintiff Wilbert Lavely (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Michigan who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving

conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

40.     Plaintiffs Kristopher Lowe and Yvonne Lowe (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2015 GMC 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

41.     Plaintiff Jeff Luken (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2016 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions

and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

42.     Plaintiff Stephen Mays (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on

additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

43.     Plaintiff Christian McElwee (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2011 Chevrolet 3500 and a 2016 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low

emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

44.    Plaintiff Hunter Mindek (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Pennsylvania who acquired a 2016 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the

time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

45.     Plaintiff Jason Mohlke (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2014 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and

performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of

the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

46.     Plaintiffs Terry Mohlke and Lorene Mohlke (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2013 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the

Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

47.     Plaintiff Jeffrey Moore (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2016 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually

emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

48.     Plaintiff Paul Morris (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Kentucky who acquired a 2013 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired

the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

49.    Plaintiff Glen Neely (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Michigan who acquired a 2014 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not

37

disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

50.     Plaintiffs Michael Palmer and Gloria Palmer (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2016 GMC 2500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair,

unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

51.   Plaintiff Michael Redd (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional

fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

52. Plaintiff Matthew Robbins (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of

GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

53.     Plaintiffs Terry Robinson and Marilyn Robinson (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2015 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs

further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

54. Plaintiff William Rundle (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied

with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

55.     Plaintiff Robert Sandberg (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the

time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

56.     Plaintiff Steve Schemerhorn (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2012 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and

performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of

the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

57.     Plaintiff Brent Schuck (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would

have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

58.     Plaintiff Kyle Schuck (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it.

Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

59.     Plaintiff Kelly Shanley (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Michigan who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on

additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

60.    Plaintiff Heidi Shaw (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied

with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

61.     Plaintiff Matthew Spencer (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2011 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the

time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

62.     Plaintiff Michael Summers (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and

performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of

the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

63.     Plaintiff Brad Wagner (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Michigan who acquired a 2015 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine

compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

64.     Plaintiff Chris Wehmer (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually

emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

65. Plaintiffs Gary Whittemore and Kelly Whittemore (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2016 GMC 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs

selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

66.     Plaintiff Martha Wilkens (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2011 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not

disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

67.    Plaintiff Rich Wine (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Tennessee who acquired a 2015 GMC 2500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and

deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

68.     Plaintiff Darren Wireman (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Indiana who acquired a 2013 GMC 3500 in the State of Indiana. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional

60

fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

69.     Plaintiffs Steve Wray and June Wray (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2016 Chevrolet 3500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result

of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

70.     Plaintiffs John Yoder and Joyce Yoder (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Indiana who acquired a 2012 Chevrolet 2500 in the State of Indiana. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs

further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

## **OREGON**

71.     Plaintiff Jesus Andrade (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable

but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

72. Plaintiffs Bruce Becking and Linda Becking (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and

leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

73.    Plaintiff Matthew Beckman (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2011 Chevrolet 2500 in the State of Oregon.

Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the

existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

74.     Plaintiffs Brian Brewer and Carrie Brewer (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2011 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the

Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

75.    Plaintiffs Robert Cour and Christine Cour (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2016 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that

the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

76.     Plaintiff John Deshazer (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Washington who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired

the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

77. Plaintiff Kirk Dority (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2012 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not

70

disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

78.     Plaintiff Isaac Duling (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and

deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

79.     Plaintiffs Brian Engel and Rashell Engel (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Washington who acquired a 2013 GMC 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

80.     Plaintiff Luke Fortier (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations

74

and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

81. Plaintiffs Carl Gage and Gloria Gage (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2014 GMC 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel

economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

82.     Plaintiff Joseph Garrott (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Tennessee who acquired a 2013 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised

fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

83. Plaintiff Randy Gonzales (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly

disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

84.     Plaintiff Michael Grant (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving

conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

85.     Plaintiff Ryan Groom (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional

fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

86.     Plaintiff Jeff Heath (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations

and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

87.     Plaintiff James Hekker (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and

performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

88.     Plaintiff Paul Hockersmith (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2013 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its

promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

89.     Plaintiffs Kenneth Johnson and Katie Johnson (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2013 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew

about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

90.     Plaintiffs Peter Kerbs and Kay Kerbs (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2013 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that,

during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

86

91.    Plaintiffs Jeff Kershaw and Neila Vanaken (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2011 GMC 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

87

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

92.     Plaintiff Eric Klopman (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Washington who acquired a 2013 GMC 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions

and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

93.     Plaintiff Eric Klopman (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Washington and Plaintiff Travis Bowen (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon, who acquired a 2015 GMC 3500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through

advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

94.     Plaintiff Michael Leary (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable

but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

95.     Plaintiff Keith Leete (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Washington who acquired a 2013 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without

proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

96.     Plaintiff David Lewis (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 3500 in the State of Oregon. Unknown to

Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of

the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

97.     Plaintiff Robert Mager (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine

94

compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

98. Plaintiffs Chinh Nguyen and Leslie Nguyen (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2015 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that

the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

99.     Plaintiff Cody Owens (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired

the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

100.   Plaintiff James Pallo (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Montana who acquired a 2014 GMC 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or

their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

101. Plaintiff Melissa Pennington (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 GMC 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without

proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

102.    Plaintiff Brad Peters (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2011 GMC 2500 in the State of Oregon. Unknown to Plaintiff

at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or

other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

103. Plaintiff Jonathan Phelan (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine

compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

104.    Plaintiff Jeremiah Platt (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually

emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

105.    Plaintiff Darrick Ritter (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2012 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired

the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

106.    Plaintiff Brandon Roberts (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not

disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.   Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

107.     Plaintiff Alan Rockwood (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 GMC 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and

deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

108.    Plaintiff Dawn Sayles (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2013 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance

of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

109. Plaintiff Randy Smith (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the

Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

110.    Plaintiff Viktor Sorokin (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and

performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

111.    Plaintiffs Brandon Spry and Keira Coburn-Spry (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its

promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

112.    Plaintiffs Joseph Steinbruck and Julie Steinbruck (for the purpose of this paragraph, "Plaintiffs") are citizens of the State of Oregon who acquired a 2015 Chevrolet 3500 in the State of Oregon. Unknown to Plaintiffs at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiffs out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew

about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiffs selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiffs further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiffs would not have acquired the vehicle or would have paid less for it. Plaintiffs have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

113.    Plaintiff Shaun Taylor (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Idaho who acquired a 2016 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions,

exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

114. Plaintiff Lewis Titus (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2014 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM. Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional

114

fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

115.    Plaintiff Steve Woodward (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2015 GMC 3500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions

and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

116.    Plaintiff Richard Zeegers (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Oregon who acquired a 2016 Chevrolet 2500 in the State of Oregon. Unknown to Plaintiff at the time the vehicle was acquired, it only achieved its promised fuel economy and performance because it was equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in the form of overpayment at the time of acquisition, and diminished value of the vehicle. GM knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff acquired the vehicle on the reasonable but mistaken belief that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately acquired the vehicle, in part, because of the diesel system, as represented through advertisements and representations made by GM.  Before acquiring the vehicle, Plaintiff further saw and relied on

additional information and marketing by GM touting the efficiency, fuel economy, and power and performance of the engine. Had GM disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have acquired the vehicle or would have paid less for it. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations and Defendants' operation of a RICO enterprise associated with the Duramax engine system, including but not limited to a high premium for the Duramax engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high emissions and/or defective nature of the diesel engine system of the vehicle prior to acquisition.

**B.     Defendants**

**1.     General Motors**

117.    Defendant General Motors LLC (GM) is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

118.    GM, through its various entities, including Chevrolet and GMC, designs, manufactures, markets, distributes, and sells GM automobiles in this District and multiple other locations in the United States and worldwide. GM and/or its agents designed, manufactured, and installed the GM engine systems in the Silverado and Sierra vehicles. GM also developed and

disseminated the owner's manuals and warranty booklets, brochures, advertisements, and other promotional materials relating to the Fraudulent Vehicles.

**2.      The Bosch Defendants**

119.    From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC, and currently unnamed Bosch employees (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States and Europe. These vehicles include the GM vehicles in this case and the Dodge Ram 1500 EcoDiesel and Jeep Grand Cherokee EcoDiesel, as well as numerous models made by Volkswagen, Audi, Porsche, and Mercedes.

120.    The following is a list, excluding the GM vehicles in this case, of all diesel models in the United States with Bosch-supplied software whose emissions exceed federal and California emission standards and whose emissions are beyond what a reasonable consumer would expect from cars marketed as "clean" or "low emission":



121.    Bosch participated not just in the development of the defeat device, but also in the

scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover,

Bosch's participation was not limited to engineering the defeat device (in a collaboration described

as unusually close). Rather, Bosch GmbH and Bosch LLC marketed "clean diesel" in the United

States and lobbied U.S. regulators to approve "clean diesel," another highly unusual activity for a

mere supplier. These lobbying efforts, taken together with evidence of Bosch's actual knowledge

that its software could be operated as a defeat device and participation in concealing the true

functionality of the device from U.S. regulators, can be interpreted only one way under U.S. law:

Bosch was a knowing and active participant in a massive, decade-long conspiracy with

Volkswagen, Audi, Mercedes, GM, and others to defraud U.S. consumers, regulators, and diesel

car purchasers or lessees. Bosch GmbH and Bosch LLC have enabled over 1.3 million vehicles to be on the road in the United States polluting at levels that exceed emissions standards and which use software that manipulate emissions controls in a manner not expected by a reasonable consumer.

122.   Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH is the parent company of Robert Bosch LLC. Robert Bosch GmbH, directly and/or through its North American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to GM for use in the Fraudulent Vehicles. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch LLC and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Fraudulent Vehicles sold or leased in the U.S. Employees of Bosch GmbH and Bosch LLC have collaborated in the emissions scheme with GM in this judicial district and have been present in this district.

123.   Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan. Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH. Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to GM for use in the Fraudulent Vehicles.

124.   Both Bosch GmbH and Bosch LLC (together, "Bosch") operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The "Bosch Group" is divided into four business sectors: Mobility Solutions (formerly Automotive

Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufacturers and applies diesel systems, are particularly at issue here and include the relevant individuals at both Bosch GmbH and Bosch LLC. Bosch's sectors and divisions are grouped not by location, but by subject matter. Mobility Solutions includes the individuals involved in the RICO enterprise and conspiracy at both Bosch GmbH and Bosch LLC. Some individuals worked at both Bosch LLC and Bosch GmbH during the course of the RICO conspiracy. The acts of individuals described in this Complaint have been associated with Bosch GmbH and Bosch LLC whenever possible. Regardless of whether an individual works for Bosch LLC in the U.S. or Bosch GmbH in Germany, the individuals often hold themselves out as working for "Bosch." This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.[2] Bosch documents and press releases often refer to the source of the document as "Bosch" without identifying any particular Bosch entity. Thus, the identity of which Bosch defendant was the author of such documents and press releases cannot be ascertained with certainty until Bosch GmbH and Bosch LLC respond to discovery requests in this matter.

125.    Bosch holds itself out to the world as one entity: "the Bosch Group." The Diesel Systems division, which developed the EDC17, is described as part of the Bosch Group. In the case of the Mobility Solutions sector, which oversees the Diesel Systems Group, the Bosch Group competes with other large automotive suppliers.[3]

---

[2] Exhibit 2 to the Duramax Class Complaint, Dkt 18-3, Bosch 2014 Annual Report, available at http://www.bosch.com/en/com/bosch_group/bosch_figures/publications/archive/archive-cg12.php

[3] *See, e.g.*, Exhibit 3 to the Duramax Class Complaint, Dkt 18-4, Bosch's 2016 Annual Report, available at https://assets.bosch.com/media/global/bosch_group/our_figures/pdf/bosch-annual- report-2016.pdf, at 23.

126. The Bosch publication *Bosch in North America* represents that "Bosch supplies . . . clean-diesel fuel technology for cars and trucks." Throughout the document describing its North American operations, the company refers to itself as "Bosch" or "the Bosch Group."[4]

127. The *Bosch in North America* document proclaims that Automotive Technology is "Bosch's largest business sector in North America." In this publication, Bosch never describes the actions of any separate Bosch legal entity, like Bosch LLC, when describing its business, but always holds itself out as "the Bosch Group."[5]

128. German authorities are now investigating Bosch GmbH and are focusing on certain Bosch employees:[6]

> **Three Bosch Managers Targeted as German Diesel Probe Expands**
>
> A German probe into whether Robert Bosch GmbH helped Volkswagen AG cheat on emissions tests intensified as Stuttgart prosecutors said they were focusing on three managers at the car-parts maker.
>
> While Stuttgart prosecutors didn't identify the employees, the step indicates that investigators may have found specific evidence in the probe. Previously, prosecutors have said they were looking into the role "unidentified" Bosch employees may have played in providing software that was used to cheat on emission tests.
>
> "We have opened a probe against all three on suspicions they aided fraud in connection to possible manipulation in emissions treatments in VW cars," Jan Holzner, a spokesman for the agency, said in an emailed statement. "All of them are managers with the highest in middle management."
>
> Bosch, which is also being investigated by the U.S. Department of Justice, has been caught up in the VW diesel scandal that emerged

---

[4] Exhibit 4 to the Duramax Class Complaint, Dkt 18-5, *Bosch in North America* (May 2007), available at http://www.bosch.us/content/language1/downloads/BINA07.pdf, at 2.

[5] *Id*. at 5.

[6] Exhibit 5 to the Duramax Class Complaint, Dkt 18-6, *Three Bosch Managers Targeted as German Diesel Probe Expands*, Bloomberg (June 29, 2007), https://www.bloomberg.com/news/articles/2017-06-29/three-bosch-managers-targeted-as-german-diesel-probe-expands.

in 2015 over allegations its employees may have helped rig software that helped the carmaker to cheat emission tests. Earlier this year, Stuttgart prosecutors opened a similar probe into Bosch's role in connection with emission tests of Daimler cars.

A spokesman for Bosch said that while he can't comment on individual employees, the company "takes the overall allegations in diesel cases seriously and has been cooperating fully from the beginning of the probes."

The Stuttgart probe is running parallel to the central criminal investigation in Braunschweig, closer to VW's headquarters. That investigation is targeting nearly 40 people on fraud allegations related to diesel-emission software, including former VW Chief Executive Officer Martin Winterkorn.

Prosecutors' interest extends to multiple units in the VW family -- including luxury brands Audi and Porsche. In addition, Stuttgart prosecutors are also reviewing a third case related to Bosch's cooperation with Fiat Chrysler Automobiles NV on software for diesel engines.

129.    Recently researchers from Rohr-Universität in Bochum, Germany, and University of California-San Diego uncovered Bosch's role in connection with the manipulation of emission controls in certain Volkswagen and FCA vehicles. The researchers found no evidence that Volkswagen and FCA wrote the code that allowed the operation of defeat devices. All the code they analyzed was found in documents copyrighted by Robert Bosch GmbH. These researchers found that in the "function sheets" copyrighted by Robert Bosch GmbH, the code to cheat the emissions test was labeled as modifying the "acoustic condition" of the engine, a label that helped the cheat fly under the radar. Given that GM cars have a Bosch EDC17 as did the cheating Volkswagen and FCA cars, and given testing by Class Counsel experts described below that reveals defeat devices in GM cars, it is plausible to allege that Bosch was a participant in the scheme to hide the true emissions of Silverados and Sierras, and supplied a similar "function sheet" to GM to enable a similar emission deception.

## FACTUAL ALLEGATIONS

**A.  The Environmental Challenges Posed by Diesel Engines and the U.S. Regulatory Response Thereto**

130.    The United States government, through the Environmental Protection Agency, has passed and enforced laws designed to protect United States citizens from pollution and, in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to EPA rules and regulations.

131.    The U.S. Clean Air Act has strict emissions standards for vehicles, and it requires vehicle manufacturers to certify to the EPA that the vehicles sold in the U.S. meet applicable federal emissions standards to control air pollution. Every vehicle sold in the U.S. must be covered by an EPA-issued certificate of conformity.

132.    There is a very good reason that these laws and regulations exist, particularly in regards to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

133.    Diesel engines pose a particularly difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions.

134.    Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust. This causes a more powerful compression of the pistons, which produces greater engine torque (that is, more power).

135.    The diesel engine is able to do this both because it operates at a higher compression ratio than a gasoline engine and because diesel fuel contains more energy than gasoline.

136.    But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions. One byproduct of diesel combustion is oxides of nitrogen (NOx), which includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.

137.    NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2, a common byproduct of NOx reduction systems using an oxidation catalyst, is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 levels at ground level can be quite high, where they have adverse acute health effects.

138.    Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of NOx and particulate matter (PM) or soot than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion. Another way NOx emissions can be reduced is through exhaust gas recirculation or "EGR," whereby exhaust gases are routed back into the intake of the engine and mixed with fresh incoming air. Exhaust gas recirculation lowers NOx by reducing the available oxygen increasing the heat capacity of the exhaust gas mixture and by reducing maximum combustion temperatures; however, EGR can also lead to an increase in PM as well. Another way NOx and PM emissions can be reduced is through

expensive exhaust gas after-treatment devices, primarily, catalytic converters, which use a series of chemical reactions to transform the chemical composition of a vehicle's NOx emissions into less harmful, relatively inert, and nitrogen gas (N2), water (H2O) and carbon dioxide (CO2).

139.    Diesel engines thus operate according to this trade-off between price, NOx, and PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce both low PM and low NOx. In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less NOx and PM than years prior. Before introducing a Fraudulent Vehicle into the U.S. stream of commerce (or causing the same), GM was required to first apply for, and obtain, an EPA-administered COC certifying that the vehicle comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, & 86.1811-10. The CAA expressly prohibits automakers, like GM, from introducing a new vehicle into the stream of commerce without a valid EPA COC. Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. California's emission standards are even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an Executive Order, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

**B.    Both the Silverado and Sierra Share a Common Duramax Engine**

140.    To meet the EPA emissions requirements applicable to 2011 vehicles GM introduced a new Duramax V8 diesel engine in both the Silverado and Sierra.

141.    For the purposes of this complaint, the following terms are used to describe the Duramax engine found in all Silverado and Sierra vehicles at issue in this case. These two models share the same engine test group and are considered by EPA and ARB to have identical engines.

142. Common critical components of the Duramax engine are:

**1.    HCI – Hydrocarbon Injector**

143. The hydrocarbon injector (HCI) is located in the turbocharger downpipe. It is simply a fuel injector used to inject diesel fuel into the exhaust stream during active regeneration (cleaning of the diesel particulate filter). This active regeneration strategy is unique as the previous version allowed fuel to be injected into the cylinder during the exhaust stroke instead of utilizing a separate injector.

**2.    DOC – Diesel Oxidation Catalyst**

144. The diesel oxidation catalyst (DOC) converts hydrocarbons and carbon monoxide into water and carbon dioxide through an oxidization reaction. The DOC also converts nitric oxide to nitrogen dioxide to generate favorable conditions for the reduction of NOx in the SCR system downstream of the DOC. Finally, the DOC oxidizes fuel injected from the HCI to generate the temperatures required for active regeneration.

**3.    Diesel Exhaust Fluid Injector**

145. The diesel exhaust fluid (DEF) is injected downstream of the DOC. DEF is composed of 32.5% urea (its active ingredient), distilled water, and a very small amount of additives. Because of its urea content, some people call the process "urea injection." DEF is required for the selective catalytic reduction process to occur. The heat of the exhaust converts the DEF into carbon dioxide and ammonia.

**4.    SCR – Selective Catalytic Reduction**

146. Once DEF is added to the exhaust, it travels through the selective catalytic reduction (SCR) catalyst. Here, oxides of nitrogen (NOx) are converted to nitrogen gas (N2) and water (H2O) by means of a reduction reaction. The SCR system significantly reduces NOx

emissions, reducing the frequency of active regeneration cycles and allowing for more freedom in the calibration of the engine. The drawback of SCR is its increased complexity and the need to carry and replenish the urea fluid (also known by its trademark name AdBlue).

### 5. DPF – Diesel Particulate Filter

147. Once the exhaust stream has been treated by the DOC and SCR, it travels through the diesel particulate filter (DPF), where particulate matter (soot) is trapped and stored. The DPF is cleaned through a process known as regeneration, which is divided into two strategies. Passive regeneration occurs at any time the vehicle is being operated and the exhaust gas temperature is high enough to burn the particulate matter trapped by the filter. It is a continuously occurring process, meaning that it naturally occurs whenever the conditions are met under normal operation. Active regeneration occurs only when the engine senses that the DPF needs to be cleaned as the DPF is approaching maximum capacity and generating too much exhaust backpressure. When active regeneration occurs, fuel is injected into the exhaust stream via the HCI to increase the exhaust gas temperature so that the particulate matter can be burned off at carbon's non-catalytic oxidation temperature. Active regeneration dramatically reduces fuel economy since fuel is being used for purposes other than moving the vehicle. The exhaust system features a specifically designed air-cooled exhaust tip to reduce the heat of the exhaust gases as they are expelled. While the DPF is highly effective at trapping particulates, as the amount of particulates accumulates, the resistance to air flow increases also, increasing the load of the engine. To purge the DPF of accumulated deposits, it must undergo a regeneration cycle approximately every 500 km, lasting about 30 minutes. DPF regeneration requires high exhaust temperatures of approximately 600°C that are almost never achieved under normal engine operating conditions. Unfortunately, these conditions may not arise in normal urban driving, requiring the ECU to perform *active*

*regeneration*. In this mode, the ECU adjusts engine operation to increase exhaust temperature to regenerate the DPF; however, if the vehicle is only driven for short distances, such a temperature may never be reached. At sufficiently high soot load, the vehicle will illuminate a special warning lamp, prompting the driver to drive the vehicle at increased speed to allow active regeneration to take place. Thus, while the DPF is highly effective at reducing particulate emissions, it imposes a performance penalty and can become a hassle for owners who drive their vehicle for short distances.

### 6. EGR – Exhaust Gas Recirculation

148.    Exhaust gas recirculation (EGR) is used to reduce NOx emissions. Since oxides of nitrogen form in oxygen rich, high temperature environments, introducing exhaust gases back into the intake air charge reduces the amount of these compounds that form. Exhaust gas recirculation is not a new technology and has been regularly used on diesel engines for many years.

149.    The following is a depiction of these components:



### C. Emission Test Cycles and Emission Standards

150.    An emissions test cycle defines a protocol that enables repeatable and comparable measurements of exhaust emissions to evaluate compliance. The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the speed and load over time that is used to simulate a typical driving scenario. An example of a driving cycle is shown in Figure A. This graph represents the

FTP-75 (Federal Test Procedure) cycle that has been created by the EPA and is used for emission certification and fuel economy testing of light-duty vehicles in the U.S. The cycle simulates an urban route with frequent stops, combined with both a cold and a hot start transient phase. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of 11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

**Figure A**



151.    Besides urban test cycles such as FTP-75, there are also cycles that simulate driving patterns under different conditions. To assess conformance, several of these tests are carried out on a chassis dynamometer, a fixture that holds a car in place while allowing its drive wheel to turn with varying resistance. Emissions are measured during the test and compared to an emissions standard that defines the maximum pollutant levels that can be released during such a test. In the U.S., emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by the California Air Resources Board (CARB). California standards are also used by a number of other states ("Section 177" states). Together with California, these states cover a significant fraction of the U.S. market, making them

a de facto second national standard. In Europe, the emissions standards are called Euro 1 through Euro 6, where Euro 6 is the most recent standard—in effect since September 2014.

152.    The FTP-75 is the primary dynamometer cycle used to certify the light- and medium-duty passenger cars/trucks. This cycle is primarily a dynamic cycle, with rapid changes in speed and acceleration meant to reflect city driving along with some steadier higher speed sections meant to account for some highway driving.

153.    One critically important thing to understand about the FTP-75 is that it's a "cold start" cycle. That means the vehicle starts the cycle with the engine having been off for at least eight hours and in a completely cold state. The "cold start" portion of the test is challenging for diesel engines like the Duramax employing SCR because catalysts meant to control emissions are not yet at temperatures where they work (i.e., above their "light-off" temperature).

**D.    GM Profited from Using Multiple Defeat Devices in Its Duramax Diesel Powertrains**

154.    As noted, the Duramax exhaust treatment system consists of four components: the Exhaust Gas Recirculation System (EGR); the Diesel Oxidation Catalyst (DOC); the Selective Catalytic Reduction (SCR); and the Diesel Particulate Filter (DPF). The DPF traps particulate pollutants (like soot) but has to regenerate regularly in order to maintain low exhaust backpressure. There are two ways the DPF can regenerate: passively through catalysts built into the components (Passive Regeneration) that use NO2 (nitrogen dioxide) as the primary oxidizer, and actively, where the engine and HCI generate temperatures high enough to oxidize trapped carbon via direct (i.e., non-catalytic) oxidation (Active Regeneration). Active Regenerations generally, though not always, require the vehicle to be driven at highway speeds for a continuous period. Active Regeneration reduces fuel economy, decreasing miles per gallon and engine efficiency. Thus, manufacturers like GM seek to minimize Active Regeneration cycles. Active Regeneration also

leads to excessive NOx and reduces the life span of the SCR catalyst as the high temperatures drive hydrothermal aging and deactivation of the SCR catalyst.

155.   Passive regeneration relies on the presence of NOx (specifically NO2) to catalytically oxidize captured soot. The catalyst oxidizes nitric oxide to nitrogen dioxide, which then reacts at relatively low temperatures to oxidize and remove captured soot. That is, it works best when the exhaust passing through the DPF still contains high levels of NOx pollutants that trigger the catalyst to regenerate the filter. As a result, most diesel engine manufacturers put the DOC upstream of the SCR system where NOx concentrations are still relatively high and the DPF is more likely to regenerate via the passive regeneration mechanism.[7]



**Figure 11.** Schematic of typical US 2010 aftertreatment system

156.   While the SCR is very effective at reducing NOx emissions, it requires hot exhaust for the urea catalyst to function properly. Thus, when it is placed downstream of the DPF, so as to increase Passive Regeneration and decrease the need for Active Regeneration, the system takes some time to warm up and does not work well when the engine system is cold. The DPF absorbs much of the heat during exhaust warmup and delays the time for the SCR catalyst to reach its light-off temperature.

157.   But emissions testing to allow trucks such as those at issue here to be sold in the United States requires a "cold start" emissions measurement. That is, trucks must emit low levels

---

[7] Exhibit 6 to the Duramax Class Complaint, Dkt 18-7,Hannu Jääskeläinen et al., *Heavy-Duty Diesel Engines with Aftertreatment*, DieselNet (Dec. 2016), https://www.dieselnet.com/tech/engine_heavy-duty_aftertreatment.php.

of NOx even when they have just started and are not yet operating at high exhaust temperatures. GM did not want to increase Engine Gas Recirculation (EGR) or use other inefficient methods to reduce "cold start" emissions, so it departed from the DOC–DPF–SCR order that other manufacturers use and designed its Duramax engines with the SCR system closer to the engine than the DPF. In the Duramax, the order is as follows:



158.    This configuration allows the SCR system to warm up sooner, thus allowing sufficiently reduced NOx emissions to pass the cold start test required for certification. But there is a catch. Because the NOx is reduced before the exhaust reaches the DPF filter, there is little Passive Regeneration in the DPF. Without relatively high NOx levels going into the DPF, more active regenerations would be required, resulting in reduced fuel economy, reduced lifetime of the SCR catalysts, and a significant increase in overall NOx emissions.

159.    GM was unwilling to leave the lucrative diesel market to other manufacturers. Unknown to GM other manufacturers, like FCA, also were unable to meet the new emission requirements. So, unwilling to be left behind, GM plunged ahead.

160.    GM's solution to its problem was to use at least three separate "defeat devices" to increase engine power and efficiency, increase NOx levels into the DPF, and decrease the need for Active Regeneration. These defeat devices are explained in detail below. GM could not meet the new and tougher emissions requirements effective in 2011 without these devices. GM cared not

that these defeat devices caused the Duramax engine to emit 1.5 to 5.5 times the permissible limit for deadly NOx pollutants during real-world driving.

161.    The defeat devices solved GM's problem by decreasing the dosing of urea used by the SCR system and reducing the overall EGR rate: above (Defeat Device 1) and below (Defeat Device 2) the narrow temperature band in which certification testing is performed (68-86°F); and decreasing the dose of the SCR system and rate of EGR (Defeat Device 3) after 5-8 minutes of relatively constant engine speed (which never happens during an emissions test). By decreasing the dosing of urea, the SCR allows more NOx to pass through to the DPF, thus increasing Passive Regeneration in the DPF and decreasing the need for Active Regenerations, which reduce fuel economy, reduce the lifetime of the SCR catalysts, and result in significant increases in overall NOx emissions. Reduced urea dosing has the added advantage of lower urea consumption, which means lower operating costs and longer service intervals between having to fill the urea catalyst tank.

162.    Thus, by putting the SCR in front of the DPF and employing the defeat devices, GM was able to market and sell Duramax-equipped trucks with power and efficiency characteristics that made them very appealing but also caused illegal levels of deadly NOx pollution. If GM had not employed illegal defeat devices, then its trucks would have been less efficient and less powerful, meaning that GM would not have sold as many and would not have been able to charge a premium for them.

## E.    GM Promoted the Silverado and Sierra Duramax as Low Emission Vehicles Because It Knew the Environment Is Material to a Reasonable Consumer

163.    GM understood that a vehicle's pollution footprint is a factor in a reasonable consumer's decision to purchase a vehicle. GM, in press releases, owner's manuals, and brochures that it intended to reach the eyes of consumers, promoted the Duramax engine as delivering "low

emissions" or having "reduced NOx emissions." GM was acutely aware of this due to the public

perception that diesels are "dirty."

164.    Here is an example of GM promoting clean diesel:[8]



165.    The following are examples of GM advertising promoting lower emissions, power,

and fuel economy.

**1.    Silverado advertising promises "a remarkable reduction" in emissions and fuel economy.**

166.    GM's brochure for the Sierra Duramax engine promised "low emissions" and

"great power":[9]

**DIRECT INJECTION TECHNOLOGY**

For fast starts in cold weather, quiet operation and maximum efficiency, the direct injection system helps Sierra HD with the available DURAMAX diesel engine start in as little as 3 seconds at

---

[8] Exhibit 7 to the Duramax Class Complaint, Dkt 18-8, *Five Diesel Myths Debunked*, GM, available at http://www.torquenews.com/sites/default/files/image-119/%5Btitle-raw%5D/ dieselmyths_v2.jpg (last accessed May 24, 2017).

[9] Exhibit 8, to the Duramax Class Complaint, Dkt 18-9, *2016 Sierra 2500*, GMC, http://www.gmc.com/previous-year/ sierra-2500hd-pickup-truck.html (last accessed May 24, 2017) (emphasis added).  Nearly identical representations were made in the brochures for the 2011-2015 Sierra 2500's,

-40°C and operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, delivering *low emissions and great power*….

167.    A 2011 Silverado GM publication promised a 63% reduction in emissions over the previous model and more horsepower and torque:[10]

### New system reduces tailpipe NOx emissions

The enhanced, legendary Duramax 6.6L Turbo-Diesel is the most powerful Duramax ever built-generating more horsepower and torque than any competitor. This proven powerplant gets the job done while being *friendlier to the environment*.

The improved Duramax uses the *latest emission control technology, reducing Nitrogen Oxide (NOx) emissions by a whopping 63%*, when compared to the 2010 model. GM engineers determined the best way to accomplish *this remarkable reduction of diesel emissions was to* employ a Selective Catalytic Reduction (SCR) system that uses Diesel Exhaust Fluid (DEF).

### Diesel exhaust fluid (DEF)

Diesel Exhaust Fluid (DEF) is a non-flammable fluid comprised of 33% ammonia-based urea and 67% purified water. DEF is used with diesel engine exhaust systems to reduce the amount of emissions produced by turning Nitrogen Oxide (NOx) into nitrogen and water vapor. DEF technology has a proven track record since it has been used in Europe for years.

168.    The GM 2011 publication represented that the Duramax "runs cleaner."[11]

---

[10] Exhibit 9 to the Duramax Class Complaint, Dkt 18-10, *Using Diesel Exhaust Fluid with the Duramax 6.6L Turbo-Diesel*, Chevrolet (emphasis added).
[11] *Id*.





169.    The publication went into detail concerning emissions reduction:[12]

---

[12] *Id.*



170.    The 2011 document contained additional information on reducing emissions:[13]



**DIESEL EXHAUST FLUID (DEF)**

Diesel Exhaust Fluid (DEF) is a non-flammable fluid comprised of 33% ammonia-based urea and 67% purified water. DEF is used with diesel engine exhaust systems to reduce the amount of emissions produced by turning Nitrogen Oxide (NOx) into nitrogen and water vapor. DEF technology has a proven track record since it has been used in Europe for years.

171.    A 2011 advertisement for the Duramax engine stated:[14]

---

[13] *Id.*

[14] Exhibit 10 to the Duramax Class Complaint, Dkt 18-11, 6.6L Duramax LML, Duramax Hub, http://www.duramaxhub.com/lml.html (last accessed May 24, 2017) (emphasis added).

**6.6L Duramax LML**
**Duramax LML SPECS & INFO**

The LML Duramax was released for 2011 model General Motors & Chevrolet HD trucks. The latest version of the 6.6L Duramax requires *advanced emissions equipment*, including the use of diesel exhaust fluid injection, to *reduce nitrogen oxide emission levels by 63 percent* over LMM powered trucks.

172.    Elsewhere, this document promises a reduction in NOx:[15]

**LML Duramax DEF**

The LML Duramax is equipped with a SCR system that requires the use of DEF (diesel exhaust fluid). DEF is injected into the exhaust stream where a chemical reaction occurs that reduces NOx emissions. The DEF tank is approximately 5 gallons (18.9 liters). On pickup trucks, the DEF tank fill nozzle is located on the passenger side, under the hood and is sealed by a blue cap. On vans, the DEF tank fill nozzle is located in the fuel fill door, and is also sealed by a blue cap. The DEF system will illuminate a warning indicator in the instrument panel when the DEF fluid levels range is estimated to be 1,000 miles. Subsequent warnings will follow.

173.    A press release for the 2013 Silverado 2500 and 3500 indicates that "Highlights of the Duramax diesel include . . . greater fuel efficiency, improved performance and reduced emissions."[16]

174.    A brochure for the 2014 Silverado promised fuel efficiency and lower emissions:[17]

**FUEL EFFICIENCY**

On the Vortec 6.0L V8 engine, Variable Valve Timing (VVT) adjusts airflow in and out of the combustion chamber under all engine speeds, which helps lower emissions and improve fuel economy.

---

[15] *Id.*

[16] Exhibit 11 to the Duramax Class Complaint, Dkt 18-12, GM Press Release, Chevrolet Silverado 2500HD and 3500HD, available at https://media.gm.com/content/media/us/en/chevrolet/vehicles/silveradohd/2013/_jcr_content/iconrow/textfile/file.res/13_PG_Chevrolet_SilveradoHD.pdf (last accessed Aug. 3, 2017)

[17] Exhibit 12 to the Duramax Class Complaint, Dkt 18-13, 2014 Silverado HD brochure, at 5.

2. **Sierra advertising promises emissions and fuel economy.**

175.   The Sierra 2500 and 3500 was introduced in 2011. GMC promised that the Duramax Diesel "delivers 11 percent better highway fuel economy than previous models." GMC also promised that the engine turned the diesel by-product into a fine mist that results in "lower emissions":[18]



---

[18] Exhibit 13 to the Duramax Class Complaint, Dkt 18-14, 2011 GMC Sierra Heavy Duty brochure, available at
https://www.gmc.com/content/dam/GMC/global/master/nscwebsite/en/home/Tools/Download_A_Brochure/01_Images/2011-sierra-2500-and-3500-brochure.pdf (last accessed Aug. 3, 2017).

176.    GM's advertising for the Sierra consistently featured claims of "low emissions" and great power:[19]

**2016 Sierra 2500HD**

**DIRECT INJECTION TECHNOLOGY**

For fast starts in cold weather, quiet operation and maximum efficiency, the direct injection system helps Sierra HD with the available Duramax diesel engine start in as little as 3 seconds at -40°C and operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, delivering *low emissions and great power*.

177.    An owner's manual for the 2011 Duramax vehicles promised a "whopping reduction" in emissions:[20]

**NEW SYSTEM REDUCES TAILPIPE NOx EMISSIONS**

The enhanced, legendary Duramax 6.6L Turbo-Diesel is the most powerful Duramax ever built-generating more horsepower and torque than any competitor. This proven powerplant gets the job done while being friendlier to the environment.

The improved Duramax uses the latest emission control technology, reducing Nitrogen Oxide (NOx) emissions by a *whopping* 63%, when compared to the 2010 model. GM engineers determined the best way to accomplish *this remarkable reduction of diesel emissions was* to employ a Selective Catalytic Reduction (SCR) system that uses Diesel Exhaust Fluid (DEF).

178.    A 2011 GM press release promised more power and lower emissions:[21]

New 6.6L Duramax diesel delivering more power, up to 11-percent greater highway fuel economy up to 63- percent lower emissions, B20 biodiesel capability and quicker acceleration

---

[19] Exhibit 8 to the Duramax Class Complaint, Dkt 18-9, 2016 Sierra 2500, GMC, http://www.gmc.com/previous-year/ sierra-2500hd-pickup-truck.html (last accessed May 24, 2017) (emphasis added)

[20] Exhibit 9 to the Duramax Class Complaint, Dkt 18-10, *Using Diesel Exhaust Fluid with the Duramax 6.6L Turbo-Diesel*, Chevrolet (emphasis added)

[21] Exhibit 14 to the Duramax Class Complaint, Dkt 18-15, 2011 GMC Sierra 2500HD Denali 2500HD highlights and information, GMC Pressroom, http://media.gmc.com/media/us/en/gmc/vehicles/ sierra_hd/2011.brand_gmc.html (last accessed May 24, 2017)

179.    Another example, from the 2015 GMC Sierra 2500HD brochure, promises "lower emissions":[22]

> FOR FASTER STARTS IN COLD WEATHER, QUIETER OPERATION AND MAXIMUM EFFICIENCY, DIRECT INJECTION HELPS THE AVAILABLE DURAMAX DIESEL START IN AS LITTLE AS 3.0 SECONDS AT -40QF AND OPERATE AT NEARLY 30,000 PSI TO TURN HEAVY DIESEL FUEL INTO A FINE MIST, ***BURNING CLEANER AND FASTER WITH LOWER EMISSIONS AND GREATER POWER*** THAN THE PREVIOUS MODEL.

180.    An advertisement for the 2014 GMC Sierra 2500HD promises "lower emissions":[23]

> Duramax HIGH-PRESSURE DIRECT INJECTION For fast starts in cold weather, quieter operation and maximum efficiency, the direct-injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, *burning clean and fast with lower emissions*.

181.    An advertisement for the 2013 GMC Sierra 2500HD promises "reduced emissions and a better fuel budget":[24]

> Duramax B20 BIODIESEL CAPABILITY To reduce carbon dioxide emissions and stretch your fuel budget, the Duramax 6.6L can operate on B20 biodiesel a mix of 20 percent biodiesel from domestic, renewable resources, and 80 percent petroleum diesel.

182.    An advertisement for the 2012 GMC Sierra 2500HD promises "clean and lower emissions":[25]

---

[22] Exhibit 15 to the Duramax Class Complaint, Dkt 18-16, 2015 GMC Sierra 2500HD brochure, available at http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_ 2015-2.pdf (last accessed May 24, 2017) (emphasis added).

[23] Exhibit 16 to the Duramax Class Complaint, Dkt 18-17, 2014 GMC Sierra 2500HD brochure, available at http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_ 2014.pdf (last accessed May 24, 2017) (emphasis added).

[24] Exhibit 17 to the Duramax Class Complaint, Dkt 18-18, 2013 GMC Sierra 2500HD brochure, available at http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2013.pdf (last accessed May 24, 2017).

[25] Exhibit 18 to the Duramax Class Complaint, Dkt 18-19, 2012 GMC Sierra 2500HD brochure, available at http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2012.pdf (last accessed May 24, 2017).

> Duramax HIGH-PRESSURE DIRECT INJECTION For fast starts in cold weather, quieter operation and maximum efficiency, the direct injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower emissions and greater power than the previous model.

183.    A brochure for the 2011 Silverado promises that, "The new, available Duramax runs cleaner too, with a 60% reduction in NOx emissions from our previous model."

184.    A brochure for the 2013 Sierra promotes "cleaner" emissions:

**DURAMAX HIGH-PRESSURE DIRECT INJECTION**

> For fast starts in cold weather, quieter operation and maximum efficiency, the direct injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning cleaner and faster with lower emissions and greater power than the previous model.

185.    A brochure for the 2014 Sierra promises to have been "born of a strict adherence to engineering excellence," and lower emissions:

**DURAMAX HIGH-PRESSURE DIRECT INJECTION**

> For fast starts in cold weather, quieter operation and maximum efficiency, the direct-injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower emissions.

**F.      The Deception**

**1.      The 2013 Silverado 2500 diesel test setup.**

186.    Experts for Class Counsel in the Duramax Class Action have extensively tested a 2013 Silverado 2500 diesel using a Portable Emissions Measurement System (PEMS).  Below is a description of the testing and the results they reported.

187.    The vehicle was representative of the class of Duramax diesel engines present in both the Chevrolet Silverado and GMC Sierra model years 2011 to 2016. The population of both

the 2500 series and 3500 is large, though the population will most certainly be dominated by the 2500 series. For this reason, a 2500 series was chosen.

188.    The vehicle as acquired had approximately 51,000 miles. It was therefore less than mid-way through its full useful life and was still covered under the emissions warranty. Furthermore, the vehicle was factory certified at the time of purchase.

189.    The vehicle went through a rigorous check-in process. The vehicle was placed on a hydraulic rack, the underbody cowlings were removed, and the emission control system was examined to confirm the configuration was as expected and that parts were intact and free from damage. The emissions tag was analyzed and compared to the expected emission control group to ensure beyond a shadow of a doubt that the right engine was present and is being compared to the right certified emission standard.

190.    The vehicle was also checked for engine faults and maintenance to ensure the maintenance records are clean and that there are no fault codes related to the emission control system. In this case, the vehicle purchased was factory certified, as previously mentioned.

191.    The tire pressure and vehicle weight were checked, and the vehicle was loaded to the weight for the test configuration, in this case 9,500 lbs, so that the configuration is equivalent to the certification configuration.

**2.    Initial results indicate higher than expected emissions.**

192.    The testing confirmed that the vehicle complied with emissions standards at the temperature windows where the emissions test is performed for certification. But the NOx emissions increase significantly when the temperature is below 68ºF or above 86ºF. This means that GM, using software supplied by Bosch, employs a "defeat device" that allows the vehicle to

meet emissions standards in the test temperature range. At all other times, NOx was allowed to be emitted in a much greater amount.

193.   The experts created a special program that is specific to each vehicle to allow communication with the vehicle's computer (ECM) in order to extract important operational information like exhaust temperatures, EGR rates, NOx concentrations upstream of the SCR catalysts, and other information the vehicle's computer might collect.

194.   The Silverado was certified at 100 mg/mile for the highway fuel economy standard test (HWFET), where the standard is 400 mg/mile. Initial testing at steady 60 mph speeds indicated emissions of 533 mg/mile on flat roads or 1.3 times the standard. The Silverado's emission on flat roads for the stop and go standard was 538 mg/mile or 2.7 times the standard of 200 mg/mile.

195.   Further testing was done by Class Counsel experts in stop-and-go conditions with average speeds and relative positive acceleration values that correlate well with the FTP-75 emissions cycle. The blue dots show data where the defeat device below 68°F was active; the green dots represent conditions within the certification temperature window (68°F-86°F); the red dots represent data where the defeat device above 86°F was active. The vertical blue lines represent the temperature limits of the test standard for the test cycle, while the horizontal red line represents the emission standard.



196.    One important point must be emphasized in analyzing this data. The PEMS temperature sensor, which collects ambient temperature data, is mounted on top of the vehicle (*i.e.*, at roof level), shielded from the sun by horizontal white metal fins, and well ventilated. This is the ideal setup to collect the true ambient temperature of the surroundings without complication from the sun's radiant heat or stagnant heating because of poor flow.

197.    The vehicle's ambient temperature sensor, by contrast, is usually mounted in front of the radiator close to the road. These sensors are not necessarily shielded from the sun and are highly susceptible to false readings at high ambient temperatures from heat generated by hot black top.

198.    When it comes to a defeat device based on ambient temperature, obviously the vehicle will be using its own sensors to trigger the defeat. There are several temperature sensors in the intake manifold for the engine, any combination of which could be used to trigger a defeat device (in addition to the possible use of the ambient temperature sensor). The temperature sensors may not directly measure ambient temperature but are certainly related to ambient temperature. Therefore, the cutoff temperatures, as measured by the PEMS ambient temperature sensor, are not necessarily exactly 68°F or 86°F.

199.    It should be noted that the effect of ambient temperature on the inlet NOx concentrations, the inlet temperature to the SCR catalyst, and outlet temperature of the SCR catalyst were studied to rule out the possibility of delayed light-off because of low ambient temperature. When compared to cold start conditions within the certification temperature window, the cold start temperatures into and out of the SCR catalyst as well as the NOx concentrations into the SCR catalyst were found to be the same. Thus, the effect of ambient temperature on its own was ruled out as the cause of the high cold start emissions at cold temperature. Clearly, the engine was programmed to produce higher emissions at temperatures below 68°F.

200.    The points labeled with a "C" are cold start tests, with distances, RPAs (relative positive accelerations), average speeds, and overall distance that represent very well the characteristics of the FTP-75 certification cycle. In the case of temperatures below 68°F, cold start emissions exceed the standard by a factor of 2.1 at 428 mg/mile of NOx with a maximum of 483 mg/mile. During active regenerations, emissions are 1,402 mg/mile on average, or 7 times the emission standard. In the certification temperature window, cold start emissions are 178 mg/mile, which is close to the certification emissions of 200 mg/mile and below the standard of 200 mg/mile. At temperatures above 86°F, cold start emissions were not examined in great detail

because hot start emissions were so far in excess of the standard. On average, emissions above 86°F are 479 mg/mile (2.4 times the standard), with excursions as high 1,153 mg/mile (5.8 times the standard).

201.    It should be noted, significantly, that the same high temperature behavior was observed in the Chevrolet Cruze and is part of that vehicle's defeat strategy. Given that the Silverado is a Chevrolet product, it is not surprising that the same defeat strategy was employed.

202.    Based on a study of temperatures in 30 major metropolitan areas as well as the demographics of Silverado sales, Class Counsel experts estimated that the high temperature defeat device is active 30-35% of the total population vehicle miles traveled (VMT). Similar estimates show that the cold temperature defeat device is active approximately 35% of the VMT. In total, these two defeat devices are active 65-70% of VMT with emissions that are 2.1 to 5.8 times the standard.

203.    This type of emissions performance is not what a reasonable consumer would expect from a vehicle that "turns NOx into nitrogen and water vapor," or "into a fine mist," or "reduces emissions by a whopping amount."

**3.      Further testing by Class Counsel experts demonstrates that GM—enabled by Bosch's EDC17—employs three defeat devices.**

204.    Further testing by experts for the Class Counsel for the Duramax Class Action was conducted so that the vehicle was tested for over 3,500 miles and over a wide range of conditions.

205.    The testing confirmed the existence of three "defeat devices." The three cheats, or defeat devices, are:

**Defeat Device One:**

The vehicles produce emissions above the certification tests at temperatures above the certification range (86ºF).

**Defeat Device Two:**

The vehicles produce higher emissions when temperatures are below the certification test range (68°F).

**Defeat Device Three:**

Higher emissions occur after the vehicle has been run for 200-500 seconds of steady speed operation on average by a factor of 4.5 in all temperature windows.

### a.    Defeat Devices One and Two: the Temperature Defeat Devices

206.    The test results for Defeat Device One, in stop and go testing with temperatures above 86°F, were 2.4 times the emissions standard, with maximum measured emissions of 1,153 mg/mile or 5.8 times the standard.

207.    The test results for Defeat Device Two, in stop-and-go testing at temperatures below 68°F, were 2.1 times the emissions standard.

208.    Further testing at temperatures below 68°F revealed that the vehicle had several active regenerations. Such regenerations were on average 7 times the emissions standard.

### b.    Defeat Device Three: the Steady Speed Time-Out Defeat

209.    In controlled track testing at steady speed, following at steady speeds of 40, 50, and 60 mph, the following observations were made. The blue line represents the NOx emissions in mg/mile, while the orange line shows vehicle speed in km/hour. What is clear is that NOx emissions increased over time and markedly about 500 seconds after the steady speed is achieved (40 mph in this case). This is counterintuitive as, if anything, emissions performance should improve as the catalyst warms ups. It should be noted, importantly, that this data was taken at ambient temperatures in the certification test window.

210.     In this case, the emissions increase by about a factor of 4, while the EGR rate and SCR reduction are significantly reduced. Note that $CO_2$ emissions go down, which would be reflected in better fuel economy.

211.     The motivation for such a defeat is simple. It increases the NOx going into the DPF, thereby ensuring better passive regeneration performance and, perhaps just as important, better fuel economy. Furthermore, decreasing the effectiveness of the SCR system economizes urea usage, which leads to improved customer satisfaction. Lower EGR rates and higher NOx mode are generally associated with better fuel economy.

212.     An example of this timing defeat device is depicted below:



213.     The same behavior is observed in the 50 mph test. Again, a large increase in emissions (factor of 2.2) with a drop in EGR rate, a small decrease in SCR rate, and a decrease in $CO_2$ emissions (i.e., better fuel economy).



214.    At 60 mph, the same phenomenon was observed. Emissions double, while EGR

rate and SCR reduction go down.



215.    After observing this behavior on the test track, the experts reviewed previous over-

the-road test data in a variety of steady speed conditions (mostly at approximately 60 mph) and

found at least 22 instances where the same time phenomenon occurred.

216.    The following table summarizes the events observed and measured by the experts:

| Condition | Ambient Temp. (°F) | Event # | Pre timeout NOx (mg/mile) | After timeout NOx (mg/mile) | Factor Increase | Increase in NOx (mg/mile) from pre-timeout condition |
|---|---|---|---|---|---|---|
| Downhill 0.7% | 55.5 | **1** | 200 | 422 | 2.1 | 222 |
| Downhill 0.4% | 77.3 | **2** | 274 | 360 | 1.3 | 86 |
| Flat | 47 | **3** | 344 | 512 | 1.5 | 168 |
| Uphill 0.7% | 63.6 | **4** | 62 | 197 | 3.2 | 135 |
| Mild Hills | 63 | **5** | 442 | 531 | 1.2 | 89 |
| Downhill 0.7% | 52.5 | **6** | 17 | 276 | 16.2 | 259 |
| Flat | 47.6 | **7** | 21 | 191 | 9.1 | 170 |
| Downhill 0.4% | 48.3 | **8** | 94 | 372 | 4.0 | 278 |
| Downhill 0.6% | 53.3 | **9** | 47 | 265 | 5.6 | 218 |
| Downhill 0.5% | 62.9 | **10** | 149 | 408 | 2.7 | 259 |
| Flat | 78.8 | **11** | 152 | 273 | 1.8 | 121 |
| Downhill 1.3% | 70 | **12** | 152 | 596 | 3.9 | 444 |
| Uphill 1.3% | 64.9 | **13** | 177 | 1428 | 8.1 | 1251 |
| Slight hills | 68.8 | **14** | 129 | 286 | 2.2 | 157 |
| Downhill 0.5% | 62.6 | **15** | 37 | 203 | 5.5 | 166 |
| Downhill 0.4% | 73 | **16** | 72 | 393 | 5.5 | 321 |
| Flat | 75.3 | **17** | 27 | 168 | 6.2 | 141 |

| Condition | Ambient Temp. (°F) | Event # | Pre timeout NOx (mg/mile) | After timeout NOx (mg/mile) | Factor Increase | Increase in NOx (mg/mile) from pre-timeout condition |
|---|---|---|---|---|---|---|
| Downhill 0.7% | 90.1 | **18** | 28 | 309 | 11.0 | 281 |
| Downhill 0.3% | 87.9 | **19** | 61 | 164 | 2.7 | 103 |
| Downhill 0.2% | 88.4 | **20** | 94 | 231 | 2.5 | 137 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Downhill 1.4% | 67.3 | **21** | 475 | 778 | 1.6 | 303 |
| Downhill 0.3% | 102.5 | **22** | 291 | 442 | 1.5 | 151 |
| | | | | **Average** | **4.5** | **248** |

217.    The key conclusion here is that this defeat device appears to be active at all temperatures. In general, the "timeout" defeat device results in a factor of 4.5 increase in NOx once activated. The exact time for the defeat device to activate varies, but is generally 200-500 seconds. At steady speed, the average increase in NOx once the defeat device kicks in is 248 mg/mile.

218.    On average, there is a reduction in the EGR rate (from 18.9% to 17.9% pre- and post-timer) and SCR effectiveness (from 90% to 74% pre- and post-timer). The de-rated use of the SCR system would result in significant savings in urea and would also ensure better operation of the downstream DPF.

**4.      The vehicles pollute heavily when driven on hills.**

219.    Hills are not part of the testing protocol for certification of new vehicles. However, it would be a material fact to a reasonable consumer to know that the GM vehicles were polluting during hill driving of levels above what a reasonable consumer would expect to be produced by "Eco" vehicles. Testing shows that hills are challenging for GM's "clean diesels."

220.    The testing done on the Silverado indicates that in stop-and-go conditions on a hill with a grade of less than 1.5 percent, average emissions are 300 mg/mile with some excursions reading as high as 715 mg/mile. Note that road grades below 1.5 percent would be considered quite mild and are often encountered in areas that would be described as "flat." Again, there appears to be a significant increase in emissions at ambient temperatures below the certification test window.



221.    When operating on grades above 1.5 percent, average emissions were 350 mg/mile with excursions up to 704 mg/mile.



222.    Some may assume that higher emissions uphill are offset by low emissions downhill when less power is needed. Not so. When testing on a downhill mild grade at temperatures below 68ºF average, emissions were 425 mg/mile, which is higher than the same grades uphill. At temperatures above 86ºF, average emissions were 760 mg/mile, with excursions up to 3,843 mg/mile. In the second plot, the 3,843 mg/mile data point is omitted so that data points closer to the standard can be easily viewed. Downhill grades steeper than 1.5% show similar results.







223.    When tested using highway speeds on grades less than 1.5 percent, average emissions are 340, 322, and 308 mg/mile for cold, mild, and high temperatures, with excursions as high as 1,794 mg/mile. Although higher exhaust temperatures are generated under the slightly higher load generated while traveling uphill, which should result in better SCR performance, it appears the Silverado produces emissions well above the standard across all temperature ranges.



224.    When tested using highway speeds on grades above 1.5 percent, EGR rates are reduced to maintain power and average emissions increase to 1,095 mg/mile, 833 mg/mile, and 783 mg/mile for cold, mild, and high temperatures. Road grades were tested ranged between 1.8% and 4.4%. These road grades produce NOx emissions far in excess of the standard. Excursions as high as 2,621 mg/mile were observed.



225.    The same behavior is observed in mild downhill highway driving as observed with stop and go driving. These downhill emissions, which are generated under very low engine load, do not offset the extreme uphill NOx emissions. Although the vehicle is under significantly lower load than flat or uphill grades, NOx emissions are well above the standard with average emission rates of 420, 425, and 301 mg/mile for cold, mild, and high temperatures. Excursions as high as 826 mg/mile are observed, and most data points tested fall well above the standard.



226.    Downhill grades steeper than 1.5% exhibit similar performance, though none of the data points tested fell below the standard. On average, emissions were 494, 565, and 398 mg/mile for cold, mild, and high temperatures. Excursions as high as 650 mg/mile are observed. In all cases, these emission rates are well in excess of the standard.



227.    In general, contrary to what a reasonable consumer would expect, the Silverados

and Sierras pollute at high levels going both uphill and downhill.

### 5.    The test vehicle is representative of all Sierra and Silverado vehicles.

228.    Plaintiffs allege that the following GM models are affected by the unlawful, unfair,

deceptive, and otherwise defective emission controls: 2011-2016 Silverado 2500HD/3500HD

trucks and Sierra 2500HD/3500HD trucks.

229.    Class Counsel experts did not test each model to derive plausible allegations that

each Polluting Vehicle violates U.S. and CARB emissions standards and produces emissions

beyond those a reasonable consumer would have expected when he or she purchased their vehicles.

Class Counsel did not need to. As set forth in more detail below, all of the models share either

identical or very similar engines and emissions systems, allowing experts to plausibly conclude

that all Fraudulent Vehicles violate U.S. and CARB standards and the expectations of a reasonable consumer.

230. GM itself grouped the engine used for both the Silverado and Sierra into the same application and test group. CARB and EPA certified the engines in the test group which means, from an emissions standpoint, the engines are considered identical.

231. All variants of the Silverado and Sierra sold in the U.S. are well represented by both the Plaintiffs' list of vehicles and the test vehicles since GM did not change the engine in any significant way between 2011 and 2016; all vehicles employ the same generation of Duramax engine.

232. Experts for Class Counsel also conducted additional research into the technical literature to understand the various configurations of Duramax engines sold between 2011 and 2016. The literature provides some insight into the architecture of the variants of the engines. In all cases, the engines are shown to have much more commonality than not, leading those experts to conclude that there is a strong basis for sufficient similarity or "sameness" to warrant inclusion on the list of Fraudulent Vehicles. The vehicles are either equivalent from an emissions standpoint to the test vehicles or use the same core technologies and engine platforms as the test vehicles.

**G.    This Is Not the Only GM Model to Employ This Deception**

233. GM's deceptive emissions practice are also found in the GM Chevy Cruze, giving rise to the inference that its emissions manipulation strategy occurred here and is part of an overall diesel strategy employed by GM and facilitated by Bosch.

234. This is what GM promised for the Chevy Cruze:



235.    Class Counsel for the Duramax Class Action has also tested the Cruze using a Portable Emissions Measurement System (PEMS). Testing revealed that the Cruze fails to meet U.S. emissions standards as promised. The U.S. standard on the HWFET test is 70 mg/mile. In steady highway driving at 60 mph, the Cruze averaged 128 mg/mile with a high of 557 mg/mile. In stop and go driving, the average was 182 mg/mile with a maximum of 689 mg/mile, or 3.6 to 13.8 times the federal standard. When tested at temperatures below 50ºF, the NOx was 689 mg/mile and it appears the emissions control system stops working. The same is true at temperatures over 85ºF, where NOx rates were tested and ran at 450 to 550 mg/mile. The Cruze thus has a defeat device similar to the devices in the Silverado and Sierras.

**H.    The Bosch EDC17**

236.    All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control. Bosch GmbH tested, manufactured, and sold the EDC system used by Volkswagen, FCA, Mercedes, and GM. This

system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17" or

"ED17"). Upon its introduction, EDC Unit 17 was publicly touted by Bosch as follows:[26]

> EDC17 . . . controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

237. Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create

a unique set of specifications and software code to manage the vehicles' engine operation.

238. Bosch's EDC Unit 17 controls emissions by periodically reading sensor values,

evaluating a control function, and controlling actuators based on the control signal.[27] Sensor

readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil

temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs

such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear.

Based on sensor input, EDC17 controls and influences the fuel combustion process including, in

particular, fuel injection timing, which affects engine power, fuel consumption, and the

composition of the exhaust gas.[28]

---

[26] See Exhibit 19 to the Duramax Class Complaint, Dkt 18-20, Bosch Press Release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.
[27] Moritz Contag *et al.*, How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles, p.4 (2017).
[28] *Id.*

239.     All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like GM, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

240.     With respect to the Fraudulent Vehicles, the EDC 17 was used surreptitiously to evade emissions regulations. Bosch and GM worked together to develop and implement a specific set of software algorithms for implementation in the Fraudulent Vehicles, including algorithms to adjust fuel levels, exhaust gas recirculation, air pressure levels, and urea injection rates in vehicles equipped with SCR systems.

241.     Bosch and GM worked together to develop and implement a specific set of software algorithms for implementation in the Fraudulent Vehicles, which enabled GM to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[29] When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Volkswagen, GM, and other manufacturers the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause

---

[29] *See, e.g.*, Exhibit 20 to the Duramax Class Complaint, Dkt 18-21, *Engine management*, Bosch Auto Parts, http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1 (last accessed May 24, 2017).

a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the vehicle to spew the full amount of illegal NOx emissions out on the road.[30] This process is illustrated in the following diagram, applicable to GM as well:



---

242. This workaround was illegal. The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the Clean Air Act prohibits the sale of components used as defeat devices "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a certificate of compliance (COC), automakers must submit an application that lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

243. Thus, in order to obtain the COCs necessary to sell their vehicles, GM did not disclose, and affirmatively concealed from government regulators, the presence of the test-detecting and performance-altering software code that it developed with Bosch, thus making that software an illegal defeat device. In other words, GM, working closely with Bosch, lied to the government, its customers, its dealers, and the public at large.

244. Because the COCs were fraudulently obtained, and because the Fraudulent Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Fraudulent Vehicles were never covered by a valid COC, and thus were never legal for sale, nor were they EPA- and/or CARB- compliant as represented. GM and Bosch hid these facts from the EPA, CARB and other regulators, its dealers, and consumers, and it continued to sell and lease the Fraudulent Vehicles to the driving public despite their illegality and with the complicity of Bosch.

245.    GM's illegal workaround was enabled by its close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in GM's and other manufacturers' diesel vehicles.[31] Bosch was well aware that GM was using its emissions control components as a defeat device and, in fact, worked with GM to develop the software algorithm specifically tailored for the Fraudulent Vehicles.

246.    Because the COCs were fraudulently obtained, the Fraudulent Vehicles were never covered by valid COCs and thus were never offered legally for sale. GM hid these facts from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease the Fraudulent Vehicles despite their illegality and with the complicity of Bosch.

**I.     Bosch Played a Critical Role in the Defeat Device Scheme in Many Diesel Vehicles in the U.S., Giving Rise to a Strong Inference That Bosch Played a Key Role in Implementing the GM Emission Strategy**

247.    Although this case is not about Volkswagen, Bosch's history with Volkswagen provides background and support for its participation in the RICO enterprise alleged herein, of which Bosch and GM were participants. On information and belief, Plaintiffs allege that the same level of coordination between Bosch and Volkswagen also occurred between Bosch and GM.

**1.     Volkswagen and Bosch conspire to develop the illegal defeat device.**

248.    Bosch tightly controlled development of the control units in the Fraudulent Vehicles and actively participated in the development of the defeat device.

249.    As discussed above, Bosch introduced a new generation of diesel ECUs for Volkswagen.

---

[31] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See* Exhibit 22 to the Duramax Class Complaint, Dkt 18-21, *Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes- whether-its-staff-helped-vws-emissions-rigging

250.    A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, Bosch touted the EDC17 as follows:[32]

### EDC17: Ready for future demands

Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

251.    Bosch and Volkswagen worked together closely to modify the software and to create specifications for each Volkswagen vehicle model. Indeed, customizing a road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence at an automaker's facility. Such was the case with GM as well.

252.    All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts nearly total control. In fact, the software is typically locked to prevent customers, like Volkswagen and GM, from making significant changes on their own.

---

[32] *See* Exhibit 19 to the Duramax Class Complaint, Dkt 18-20, Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

253.    Bosch's security measures further confirm that its customers cannot make significant changes to Bosch software without Bosch involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security—and no such claims have been advanced— or Bosch's knowing participation.[33]

254.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:[34]

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.
>
> All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure . . . .
>
> The car company is *never* entitled by Bosch to do something on their own.

255.    Thus, Bosch GmbH and Bosch LLC cannot convincingly argue that the development of the Volkswagen defeat device was the work of a small group of rogue engineers.

256.    In fact, Volkswagen's and Bosch's work on the EDC17 reflected a highly unusual degree of coordination. It was a massive project that required the work of numerous Bosch coders

---

[33] Exhibit 23 to the Duramax Class Complaint, Dkt 18-22, *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016),  https://www.escrypt.com/en/news-events/protection-for-ecus.
[34] Exhibit 24 to the Duramax Class Complaint, Dkt 18-23, Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/ epa-investigating-bosch-over-vw-diesel-cheater-software/.

for a period of more than ten years, or perhaps more.[35] Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[36]

257.    In fact, Bosch was in on the secret and knew that Volkswagen was using Bosch's software algorithm as an "on/off" switch for emission controls when the vehicles were undergoing testing. As noted above, it has been said the decision to cheat was an "open secret" at Volkswagen.[37] It was an "open secret" at Bosch as well.

258.    Volkswagen and Bosch personnel employed code language for the defeat device, referring to it as the "acoustic function" (in German, "akustikfunktion"). As described above, the roots of the "akustikfunktion"—and likely the cheating—can be traced back to the late 1990s when Audi devised software called the "akustikfunktion" that could switch off certain functions when the vehicle was in a test mode.[38] The "akustik" term is derived from the function's ability to modify the noise and vibration produced by the engine. News articles report that, in 2006, Volkswagen further developed this "akustikfunktion" for the affected vehicles.[39]

---

[35] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See* Exhibit 22 to the Duramax Class Complaint, Dkt 18-23, *Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes- whether-its-staff-helped-vws-emissions-rigging

[36] Exhibit 19 to the Duramax Class Complaint, Dkt 18-20,  Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[37] Exhibit 25 to the Duramax Class Complaint, Dkt 18-26, Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/ us-volkswagen-emissions-investigation-idUSKCN0V02E7. *See also* Exhibit 26 to the Duramax Class Complaint, Dkt 18-27, Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw- chairman-poetsch-company-tolerated-breaches-rules (it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted")

[38] Exhibit 27 to the Duramax Class Complaint, Dkt 18-28, Martin Murphy, *Dieselgate's Roots Stretch Back to Audi*, Handelsblatt Global (Apr. 19, 2016), https://global.handelsblatt.com/edition/413/ressort/companies-markets/article/dieselgates-roots-stretch-back-to-audi?ref=MTI 5ODU1.

[39] Exhibit 25 to the Duramax Class Complaint, Dkt 18-26, Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/ article/us-

259. In sum, Bosch GmbH worked hand-in-glove with Volkswagen to develop and maintain the akustikfunktion/defeat device. On information and belief, it did so with GM as well.

**2. Volkswagen and Bosch conspire to conceal the illegal "akustikfunktion."**

260. By 2007, and likely earlier, Bosch GmbH was critical not only in developing the "akustikfunktion" but also in concealing it.

261. Bosch GmbH was concerned about getting caught participating in the defeat device fraud. As reported in a German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch GmbH warned Volkswagen by letter that using the emissions-altering software in production vehicles would constitute an "offense."[40]

**3. Volkswagen and Bosch conspire in the U.S. and Germany to elude U.S. regulators who regulated not just Volkswagen diesels but all diesels.**

262. The purpose of the defeat device was to evade stringent U.S. emissions standards. Once Bosch GmbH, Bosch LLC, and Volkswagen perfected the defeat device, therefore, their attention turned to deceiving U.S. regulators not just for the benefit of Volkswagen but also for the benefit of GM, Mercedes, and FCA.

---

volkswagen-emissions-investigation-idUSKCN0V02E7. Volkswagen Group Chairman Hans Dieter Poetsch explained that a small group of engineers and managers was involved in the creation of the manipulating software. *See* Exhibit 26 to the Duramax Class Complaint, Dkt 18-27, Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/ vw-chairman-poetsch-company-tolerated-breaches-rules. *See also* Exhibit 21 to the Duramax Class Complaint, Dkt 18-22, Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772; Exhibit 28 to the Duramax Class Complaint, Dkt 18-29, Matt Burt, *VW emissions scandal: how Volkswagen's 'defeat device' works*, Autocar (Sept. 23, 2015), http://www.autocar.co.uk/car-news/industry/vw-emissions-scandal-how- volkswagens-defeat-device-works.

[40] Exhibit 29 to the Duramax Class Complaint, Dkt 18-30, *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept. 27, 2015), http://www.autonews.com/ article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software- use-in-diesel-cars-report-says; Exhibit 30 to the Duramax Class Complaint, Dkt 18-31, *VW Scandal*: Company Warned over Test Cheating Years Ago, BBC (Sept. 27, 2015), http://www.bbc.com/news/ business-34373637.

263.    Bosch's North American subsidiary, defendant Robert Bosch LLC, was also part of and essential to the fraud. Bosch LLC worked closely with Bosch GmbH and Volkswagen in the United States and in Germany to ensure that the non-compliant affected vehicles passed U.S. emissions tests. Bosch LLC employees frequently communicated with U.S. regulators and actively worked to ensure the affected vehicles were approved by regulators.

264.    Employees of Bosch LLC, Bosch GmbH, and IAV provided specific information to U.S. regulators about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emissions standards. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from U.S. regulators about the affected vehicles— particularly CARB.

### 4.    Bosch keeps Volkswagen's secret safe and pushes "clean" diesel in the U.S. as a concept applicable to all diesel car manufacturers.

265.    Bosch not only kept Volkswagen's dirty secret safe, it went a step further and actively lobbied lawmakers to push "clean diesel" in the U.S., including making affected vehicles available for regulators to drive.

266.    As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 U.S. emission standards.[41] Its efforts ended up being a multi-year, multi-million dollar effort involving key players from both Robert Bosch GmbH in Germany and Bosch LLC in the U.S.

---

[41] Exhibit 31 to the Duramax Class Complaint, Dkt 18-32, Edmund Chew, *Bosch boosts US diesel lobbying*, Autonews (Mar. 8, 2004), http://www.autonews.com/article/20040308/SUB/403080876/ bosch-boosts-us-diesel-lobbying.

267.    Bosch's promotion of diesel technology specifically targeted the U.S. For example, Bosch put on "California Diesel Days"[42] and "SAE World Congress in Detroit."[43] In 2008, Bosch LLC and Volkswagen America co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends and engage in a vital dialogue with industry leaders and policymakers."[44]

268.    Bosch LLC hosted multi-day conferences open to many regulators and legislators and held private meetings with regulators in which it proclaimed extensive knowledge of the specifics of Volkswagen technology, including calibrations necessary for the affected vehicles to comply with emissions regulations.

269.    In April 2009, Bosch LLC organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators, and NGOs[45] with the aim of changing perceptions of diesel from "dirty" to "clean." The event featured affected vehicles as ambassadors of "clean diesel" technology, including a 2009 Volkswagen Jetta "green car." The stated goals were to "build support for light-

---

[42] Exhibit 32 to the Duramax Class Complaint, Dkt 18-33, *Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/html/734_4066.htm?section= 28799C0E86C147799E02226E942307F2 (last accessed May 24, 2017).

[43] *See, e.g.*, Exhibit 33 to the Duramax Class Complaint, Dkt 18-34, *Bosch Brings Innovation, Green Technology to SAE 2009 World Congress*, Bosch, http://www.bosch.us/content/language1/html/734_7432.htm?section=CDAF31A468D9483198ED857706 0384B3 (last accessed May 24, 2017)

[44] Exhibit 34 to the Duramax Class Complaint, Dkt 18-35,*Bosch: Clean Diesel is Key Part of Future Technology Mix*, Bosch, http://us.bosch-press.com/tbwebdb/bosch-usa/en-US/PressText.cfm? CFID=60452038&CFTOKEN=9c778a2564be2c9b-56CC21B6-96AB-5F79- 32445B13EC121DBE&nh=00&Search=0&id=364 (last accessed May 24, 2017)

[45] Exhibit 32 to the Duramax Class Complaint, Dkt 18-33,*Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/html/734_4066.htm?section=28799C0E 86C147799E02226E942307F2 (last accessed May 24, 2017); *see also* Exhibit 35 to the Duramax Class Complaint, Dkt 18-36,*California Diesel Days*, The U.S. Coalition for Advanced Diesel Cars, http://www.californiadieseldays.com/ (last accessed May 24, 2017)

duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives."

270.    In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.[46] One of this advocacy group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."[47] This group lobbies Congress, U.S. regulators, and the California Air Resources Board in connection with rules affecting "clean diesel" technology.[48]

271.    In 2010, Bosch sponsored the Virginia International Raceway with the support of the 2010 Volkswagen Jetta TDI Cup Series. This event included TDI vehicles featuring Bosch technology.[49]

272.    In 2012, Audi, BMW, Bosch, Daimler, Porsche, and Volkswagen joined to form The Clearly Better Diesel initiative.[50] The initiative was announced in Berlin by the German Association of the Automotive Industry. Its stated goal was to promote the sale of clean diesel vehicles in the U.S. The initiative's slogan was "Clean Diesel. Clearly Better."

---

[46] Exhibit 36 to the Duramax Class Complaint, Dkt 18-37, Chrissie Thompson, *New Coalition Aims To Promote Diesel Cars*, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to-promote-diesel-cars.

[47] Exhibit 37 to the Duramax Class Complaint, Dkt 18-38, *About the Coalition*, The U.S. Coalition for Advanced Diesel Cars, http://cleandieseldelivers.com/about/ (last accessed May 24, 2017).

[48] *Id. See also, e.g.*, Exhibit 38, Dkt 18-39, Letter to Chairman Mary Nichols and CARB concerning a statement made about diesel technology (Jan. 8, 2016), available at http://cleandieseldelivers.com/media/Mary-Nichols-Letter-01082016.pdf.

[49] Exhibit 39 to the Duramax Class Complaint, Dkt 18-40, *Volkswagen Jetta TDI Cup Drivers Take to the Track for the First Time in 2010 at VIR*, Volkswagen of America, Inc. (April 23, 2010), available at http://www.prnewswire.com/news-releases/volkswagen-jetta-tdi-cup-drivers-take- to-the-track-for-the-first-time-in-2010-at-vir-91985604.html.

[50] Exhibit 40 to the Duramax Class Complaint, Dkt 18-41, *"Clean Diesel Clearly Better" Campaign for Clean Diesel Cars Welcomed, Diesel Technology Forum* (Dec. 12, 2012), available at http://www.prnewswire.com/news-releases/clean-diesel-clearly-better-campaign- for-clean-diesel-cars-welcomed-183261432.html.

273.    In its efforts to promote "clean diesel," including the affected vehicles, Bosch GmbH acted on behalf of its global group.

**5.    Bosch also made the EDC17 found in FCA vehicles that pollute excessively.**

274.    To appeal to environmentally conscious consumers, FCA *vigorously* markets its "EcoDiesel" vehicles as "clean diesel" with ultra-low emissions, high fuel economy, and powerful torque and towing capacity. FCA calls its EcoDiesel "ultra clean," "emissions compliant," and claims that "***no NOx***" exits the tailpipe. FCA charges a premium for EcoDiesel-equipped vehicles. For example, selecting the 3.0-liter EcoDiesel engine for the 2016 Dodge Ram 1500 Laramie adds $4,770 to the purchase price. And the 2016 Jeep Grand Cherokee Overland EcoDiesel costs $4,500 more than its gasoline counterpart.

275.    These representations are deceptive and false. FCA programmed its EcoDiesel vehicles to significantly reduce the effectiveness of the NOx reduction systems during real-world driving conditions. The EPA has determined that the affected vehicles contain defeat devices.  On January 12, 2017, the EPA issued a Notice of Violation against FCA because FCA "failed to disclose Auxiliary Emission Control Devices (AECDs)" in the affected vehicles.[51] The EPA identified eight specific devices that cause the vehicle to perform effectively when being tested for compliance and then reduce the effectiveness of the emissions control system during normal operation and use

---

[51] Exhibit 41 to the Duramax Class Complaint, Dkt 18-42,EPA's January 12, 2017 Notice of Violation to FCA, available at  https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017- 01-12.pdf.

276.    "Once again," said CARB Chair Mary D. Nichols about FCA's cheating, "a major automaker made the business decision to skirt the rules and got caught."[52]

277.    The same experts that tested the Silverado's performance did on-road testing of the FCA vehicles and confirmed that FCA's so-called EcoDiesel cars produced NOx emissions at an average of 222 mg/mile in city driving (four times the FTP standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the U.S. highway standard of 70 mg/mile). In many instances, NOx values were in excess of 1,600 mg/mile, more than 20 times the standards. This testing occurred before the EPA announcement.

278.    Bosch made the EDC17 for the polluting FCA vehicles.

**6.      Bosch GmbH also made the EDC17 found in polluting Mercedes diesels.**

279.    Experts tested the Mercedes diesel vehicles and made the first public disclosure of Mercedes' unlawful conduct through certain of the counsel in this case in a civil suit filed in the District of New Jersey. Reportedly as a result of that lawsuit, Mercedes is under investigation by DOJ and German authorities with respect to its BlueTEC diesel vehicles. Over 14 Mercedes diesel models are alleged to produce emissions 8.1 to 19.7 times relevant standards. Bosch GmbH supplied the EDC17 in the polluting Mercedes vehicles.

**J.      The Damage from Excessive NOx**

280.    NOx contributes to ground-level ozone and fine particulate matter. According to the EPA, "Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated

---

[52] Exhibit 42 to the Duramax Class Complaint, Dkt 18-43,EPA News Release, EPA *Notifies Fiat Chrysler of Clean Air Act Violations* (Jan.12, 2017), available at https://www.epa.gov/newsreleases/epa- notifies-fiat-chrysler-clean-air-act-violations.

with premature death due to respiratory-related or cardiovascular-related effects. Children, the

elderly, and people with pre-existing respiratory disease are particularly at risk for health effects

of these pollutants."

281. The EPA describes the danger of NOx as follows:

**Acid Rain** - $NO_x$ and sulfur dioxide react with other substances in the air to form acids which fall to earth as rain, fog, snow, or dry particles. Some may be carried by the wind for hundreds of miles. Acid rain damages forests; causes deterioration of cars, buildings, and historical monuments; and causes lakes and streams to become acidic and unsuitable for many fish.



**Water Quality Deterioration** - Increased nitrogen loading in water bodies, particularly coastal estuaries, upsets the chemical balance of nutrients used by aquatic plants and animals. Additional nitrogen accelerates "eutrophication," which leads to oxygen depletion and reduces fish and shellfish populations. $NO_x$ emissions in the air are one of the largest sources of nitrogen pollution to the Chesapeake Bay.





**Toxic Chemicals** - In the air, $NO_x$ reacts readily with common organic chemicals, and even ozone, to form a wide variety of toxic products, some of which may cause biological mutations. Examples of these chemicals include the nitrate radical, nitroarenes, and nitrosamines.

**Ground-level Ozone (Smog)** - is formed when $NO_x$ and volatile organic compounds (VOCs) react in the presence of heat and sunlight. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are susceptible to adverse effects such as damage to lung tissue and reduction in lung function. Ozone can be transported by wind currents and cause health impacts far from the original sources. Millions of Americans live in areas that do not meet the health standards for ozone. Other impacts from ozone include damaged vegetation and reduced crop yields.





**Particles** - $NO_x$ react with ammonia, moisture, and other compounds to form nitric acid vapor and related particles. Human health concerns include effects on breathing and the respiratory system, damage to lung tissue, and premature death. Small particles penetrate deeply into sensitive parts of the lungs and can cause or worsen respiratory disease, such as emphysema and bronchitis, and aggravate existing heart disease.



**Global Warming** - One member of the $NO_x$ family, nitrous oxide, is a greenhouse gas. It accumulates in the atmosphere with other greenhouse gases causing a gradual rise in the earth's temperature. This will lead to increased risks to human health, a rise in the sea level, and other adverse changes to plant and animal habitat.

282.    A recent study published in NATURE estimates that there are 38,000 deaths worldwide due to excess NOx emissions.

283.    GM and Bosch will not be able to make the Fraudulent Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their fuel efficiency. As a result, even if GM and Bosch are able to make the Fraudulent Vehicles EPA-compliant, Plaintiffs will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This will necessarily result in a diminution in value of every Polluting Vehicle and it will cause owners

of Fraudulent Vehicles to pay more for fuel while using their Fraudulent Vehicles; and it results in Plaintiffs overpaying for their vehicles at the time of acquisition.

284.    Plaintiffs paid a premium of nearly $9,000, as GM charged more for its Duramax engine than a comparable gas car. For example, here is an advertisement for a 2016 Sierra 2500 indicating the Duramax costs an additional $8,595:[53]



---

285.    As a result of GM's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Fraudulent Vehicles are not "clean" diesels, emit more pollutants than do gasoline- powered vehicles, and emit more pollutants than permitted under federal and state laws, owners and/or lessees of the Fraudulent Vehicles have suffered losses in money and/or property. Had Plaintiffs known of the higher emissions at the time they purchased or leased their Fraudulent Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Moreover, when and if GM recalls the Fraudulent Vehicles and degrades the GM Clean Diesel engine performance and fuel efficiency in order to make the Fraudulent Vehicles compliant with EPA standards, Plaintiffs will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, the Fraudulent Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines.

286.    Without cheating emissions, GM could not achieve the fuel economy and range that it promises. Moreover, when and if GM recalls the Fraudulent Vehicles and degrades the Duramax engine performance in order to make the Fraudulent Vehicles compliant with EPA standards, Plaintiffs will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles as promised when purchased. And Fraudulent Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their vehicles' engines and this results in an overpayment by Plaintiffs at the time of purchase.

**K.    The GM Scheme Is Just the Latest in a Worldwide Diesel Emissions Cheating Scandal That Adds Plausibility to the Allegations as Virtually All Diesel Manufacturers Are Falsely Advertising Their Vehicles.**

287.    As noted, the world was shocked to learn that Volkswagen had manufactured over 11 million cars that were on the road in violation of European emissions standards, and over 480,000 vehicles were operating in the U.S. in violation of EPA and state standards. But Volkswagen was not the only manufacturer of vehicles that exceeded emissions standards.

288.    In the wake of the major scandal involving Volkswagen and Audi diesel vehicles evading emissions standards with the help of certain software that manipulates emissions controls (called "defeat devices"),[54] scientific literature and reports and testing indicate that most of the diesel vehicle manufactures of so- called "clean diesel" vehicles emit far more pollution on the road than in lab tests. The EPA has widened its probe of auto emissions to include, for example, the Mercedes E250 BlueTEC.

289.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen vehicles made by a variety of manufacturers, when tested, emitted significantly more NOx on real- world trips while they passed laboratory tests. The report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."[55]

---

[54] Exhibit 44 to the Duramax Class Complaint, Dkt 18-45,EPA's Sept. 18, 2015 Notice of Violation to Volkswagen Group of America, Inc., available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf. As detailed in the NOV, software in Volkswagen and Audi diesel vehicles detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, while the vehicle is running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or at the state testing station, but during normal operation they emit NOx at up to 40 times the standard allowed under U.S. laws and regulations. Volkswagen has admitted to installing a defeat device in its diesel vehicles.

[55] Exhibit 45 to the Duramax Class Complaint, Dkt 18-46,*Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*, TNO (May 18, 2015), http://publications.tno.nl/publication/34616868/a1Ug1a/TNO-2015-R10702.pdf.

290.    The report further remarked:[56]

It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words: ***In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions***.

The lack of any "effective reduction of NOx emissions" is a complete contradiction of GM's claim that its vehicles are clean.

291.    Other organizations are beginning to take notice of the emissions deception. The Transportation and Environment (T&E) organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe." T&E stated in September 2015 that real-world emissions testing showed drastic differences from laboratory tests such that models tested emitted more pollutants on the road than in their laboratory tests. "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.[57]

292.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers:[58]

---

[56] *Id.* at 6 (emphasis added).

[57] Exhibit 46 to the Duramax Class Complaint, Dkt 18-47, *VW's cheating is just the tip of the iceberg*, Transport & Environment (Sept. 21, 2015), http://www.transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.

[58] Exhibit 47 to the Duramax Class Complaint, Dkt 18-48, *Five facts about diesel the car industry would rather not tell you*, Transport & Environment (Sept. 2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_about_diesel_FINAL.pdf.

**2. The problem is endemic across the car industry – but the performance of individual models and manufacturers varies widely**

In tests by the ICCT[1] 12 out of 13 modern diesel cars failed to achieve the Euro 6 limit in on the road. The worst vehicle, an Audi, emitted 22 times the allowed limit. Emissions are highest in urban areas where most people are exposed to the pollution. On average a new diesel car emits **over** 800mg/km of nitrogen oxides driving in town compared to the limit of 80mg/km.  Data obtained on around 20 modern diesel cars by T&E shows every major manufacturer is selling cars that fail to meet Euro 6 limits on the road.  A minority of vehicles do meet the limits – but most don't. This is because the industry uses cheaper less effective exhaust treatment systems or fails to configure the best systems in a way that minimizes emissions. The cost of a modern diesel after treatment system is just €300.



293.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results."[59]

294.    Emissions Analytics is a U.K. company which says that it was formed to "overcome the challenge of finding accurate fuel consumption and emissions figures for road vehicles." With regard to its recent on-road emissions testing, the company explains:[60]

---

[59] *Id.*
[60] Exhibit 48 to the Duramax Class Complaint, Dkt 18-49,Emissions Analytics Press Release (Sept. 28, 2015), available at  http://www.abvwc.com/home/emissions-analytics.

[I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one- third above that suggested by official figures. For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found.

## TOLLING OF THE STATUTE OF LIMITATIONS

**A.      Discovery Rule Tolling**

295.    Plaintiffs had no way of knowing about GM's deception with respect to the comparatively and unlawfully high emissions of its GM Clean Diesel engine system in the Fraudulent Vehicles. To be sure, GM continues to market the Fraudulent Vehicles as "clean" diesels that have lower emissions than gasoline vehicles and also continues to claim that the Fraudulent Vehicles comply with EPA emissions standards.

296.    Within the period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the Company's true position with respect to the emission qualities of the Fraudulent Vehicles.

297.    Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that GM did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that GM had concealed information about the true emissions of the Fraudulent Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs have disclosed that GM valued profits over truthful marketing and compliance with the law.

298. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fraudulent Vehicles.

**B. Fraudulent Concealment Tolling**

299. All applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

300. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the Fraudulent Vehicles were far worse than represented, and of its disregard of the law, GM falsely represented that the Fraudulent Vehicles had emissions cleaner than their gasoline-powered counterparts, complied with federal and state emissions standards, that the diesel engines were "clean," and that it was a reputable manufacturer whose representations could be trusted.

**C. Estoppel**

301. GM was under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of emissions from the Fraudulent Vehicles and of those vehicles' emissions systems.

302. GM knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Fraudulent Vehicles.

303. Based on the foregoing, GM is estopped from relying on any statutes of limitations in this action.

**CLAIMS FOR RELIEF**

**FEDERAL CLAIMS**

**FEDERAL COUNT 1**
**FEDERAL COUNT VIOLATIONS OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT (RICO)**
**VIOLATION OF 18 U.S.C. § 1962(C), (D)**
**(On behalf of all Plaintiffs)**

304.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

305.     Plaintiffs bring this Count against Defendants GM, Robert Bosch GmbH, and Robert Bosch LLC (collectively, the "RICO Defendants" for purposes of this Count).

306.     The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

307.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

308.     For many years now, the RICO Defendants have aggressively sought to increase the sales of Fraudulent Vehicles in an effort to bolster revenue, augment profits, and increase GM's share of the diesel truck market. Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Clean Diesel Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Fraudulent Vehicles were

"clean" and "environmentally friendly." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Clean Diesel Fraud Enterprise violate Section 1962(c) and (d).

### 1. The members of the Clean Diesel Fraud Enterprise

309. Upon information and belief, the Clean Diesel Fraud Enterprise consisted of at least the following entities and individuals: GM, Robert Bosch GmbH, and Robert Bosch LLC.

310. Robert Bosch GmbH and Robert Bosch LLC tested, manufactured, and sold the electronic control module (ECM) that managed the emissions control system used by GM in the Fraudulent Vehicles. This particular ECM is more formally referred to as the Electronic Diesel Control Unit 17.

311. Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies. It wholly owns defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. As explained above, Bosch's sectors and divisions are grouped by subject matter, not location. Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to GM for use in the Fraudulent Vehicles.

312. Bosch worked with GM, Volkswagen, Mercedes, and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations. Bosch customized their EDC Unit 17s for installation in the Fraudulent Vehicles with

unique software code to detect when it was undergoing emissions testing, as described above, and did so for other vehicles with defeat devices in Volkswagen and Mercedes vehicles.[61]

313.    Bosch's conduct with respect to Volkswagen and other manufacturers, outlined below, adds plausibility to its participation in the enterprise described herein. For example, Bosch was well aware that the EDC Unit 17 would be used by automobile manufacturers, including GM, to cheat on emissions testing. Bosch was also critical to the concealment of the defeat device in communications with U.S. regulators and went even further to actively lobby U.S. lawmakers on behalf of Volkswagen and its "clean diesel" vehicles.

314.    EDC Unit 17 could not effectively lower NOx emissions to legal levels during normal operating conditions. In order to pass the emissions test, then, EDC Unit 17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions.

315.    The EDC 17 ECU was manufactured by Bosch GmbH and sold to GM. Bosch built the ECU hardware and developed the software running in the ECU. Bosch developed a "function sheet" that documents the functional behavior of a particular release of the ECU firmware. All function sheets used in the GM EDC, on information and belief, bear a "Robert Bosch GmbH" copyright.

316.    As was publicly reported, the Bosch defendants, seeking to conceal their involvement in the unlawful Clean Diesel Fraud Enterprise, sent a letter to Volkswagen AG in 2007 stating that Volkswagen Diesels *could not be lawfully operated* if the LNT or SCR after-

---

[61] Exhibit 24 to the Duramax Class Complaint, Dkt 18-25, Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/ epa-investigating-bosch-over-vw-diesel-cheater-software/.

treatment system was disabled.[62] The exact same logic applies to the GM Fraudulent Vehicles—*i.e.*, they could not be lawfully operated with the defeat device.

317.    Indeed, notwithstanding their knowledge that the Volkswagen Diesels *could not be lawfully operated* if the emissions system was disabled, the Bosch defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately *eleven million* EDC Unit 17s to Volkswagen over an eight-year period and sold hundreds of thousands of EDC units to GM for use in Fraudulent Vehicles, as well as hundreds of thousands of units to Mercedes and FCA.[63]

318.    The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.

319.    At all relevant times, the Clean Diesel Fraud Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including GM, the Bosch defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Fraudulent Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Clean Diesel Fraud Enterprise shared in the bounty generated by the enterprise—*i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.

---

[62] Exhibit 49 to the Duramax Class Complaint, Dkt 18-50, Stef Shrader, *Feds Are Now Investigating Volkswagen Supplier Bosch Over Dieselgate*, Jalopnik (Nov. 19, 2015), http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448.

[63] Exhibit 24 to the Duramax Class Complaint, Dkt 18-25, Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/ epa-investigating-bosch-over-vw-diesel-cheater-software/.

320.     The Clean Diesel Fraud Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices and software capable of allowing the engine to manipulate the software such that the emissions system is turned on or off at certain times. However, the RICO Defendants and their co- conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Fraudulent Vehicles.

321.     The Clean Diesel Fraud Enterprise engaged in and its activities affected interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Fraudulent Vehicles throughout the country and the receipt of monies from the sale of the same.

322.     Within the Clean Diesel Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Clean Diesel Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Fraudulent Vehicles to the general public nationwide.

323.     Each participant in the Clean Diesel Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Clean Diesel Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

324.     The RICO Defendants participated in the operation and management of the Clean Diesel Fraud Enterprise by directing its affairs, as described herein. While the RICO Defendants

participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

325. GM exerted substantial control and participated in the affairs of the Clean Diesel Fraud Enterprise by:

a. Designing in conjunction with Robert Bosch GmbH the Fraudulent Vehicles with defeat devices;

b. Failing to correct or disable the defeat devices;

c. Manufacturing, distributing, and selling the Fraudulent Vehicles that emitted greater pollution than allowable under the applicable regulations;

d. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

e. Introducing the Fraudulent Vehicles into the stream of U.S. commerce without a valid COC and/or EO;

f. Concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

g. Persisting in the manufacturing, distribution, and sale of the Fraudulent Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

h. Misleading government regulators as to the nature of the defeat devices and the defects in the Fraudulent Vehicles;

i. Misleading the driving public as to the nature of the defeat devices and the defects in the Fraudulent Vehicles;

j. Designing and distributing marketing materials that misrepresented and concealed the defects in the vehicles;

k. Otherwise misrepresenting or concealing the defective nature of the Fraudulent Vehicles from the public and regulators; and

l.    Illegally selling and/or distributing the Fraudulent Vehicles; collecting revenues and profits from the sale of such products; and ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

326.    Bosch also participated in, operated, and/or directed the Clean Diesel Fraud Enterprise. Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 which operated as a "defeat device" in the Fraudulent Vehicles. Bosch exercised tight control over the coding and other aspects of the defeat device software and closely collaborated with GM to develop, customize, and calibrate the defeat devices. Additionally, Bosch continuously cooperated with GM to ensure that the EDC Unit 17 was fully integrated into the Fraudulent Vehicles. Bosch also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators. Bosch collected tens of millions of dollars in revenues and profits from the hidden defeat devices installed in the Fraudulent Vehicles.

327.    Without the RICO Defendants' willing participation, including Bosch's active involvement in developing and supplying the critical defeat devices for the Fraudulent Vehicles, the Clean Diesel Fraud Enterprise's scheme and common course of conduct would not have been successful.

328.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information lies in the Defendants' and others' hands.

329.    The members of the Clean Diesel Fraud Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Fraudulent Vehicles (including the emissions components made and sold by Bosch) as

possible. Each member of the Clean Diesel Fraud Enterprise shared the bounty generated by the enterprise—i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. GM sold more Fraudulent Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all while charging consumers a premium for purportedly "clean" and "fuel efficient" Fraudulent Vehicles. The Bosch defendants, in turn, sold more EDC Units because GM manufactured and sold more Fraudulent Vehicles. The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Fraudulent Vehicles and the ability of the emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

330.    The RICO Defendants continued their enterprise even after the Volkswagen scandal became public in September 2015. GM continued to manufacture and sell 2016 Fraudulent Vehicles. Assuming top executives at GM did not know of the defeat devices in its vehicles (an assumption not true of Volkswagen or Bosch), a responsible chief executive would have inquired: Do we have a diesel problem? Either top executives at GM failed to ask questions or they agreed to continue a cover-up because GM did not stop selling Fraudulent Vehicles and has continued to conceal the truth.

### 2.    The Predicate Acts

331.    To carry out, or attempt to carry out, the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Clean Diesel Fraud Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

332. Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

333. The RICO Defendants' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a.   Application for certificates submitted to the EPA and CARB;

b.   The Fraudulent Vehicles themselves;

c.   Component parts for the defeat devices;

d.   Essential hardware for the Fraudulent Vehicles;

e.   Falsified emission tests;

f.   Fraudulently-obtained COCs and EOs;

g.   Vehicle registrations and plates as a result of the fraudulently-obtained COCs and EOs;

h.   Documents and communications that facilitated the falsified emission tests;

i.   False or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j.   Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Fraudulent Vehicles;

k.   Documents intended to facilitate the manufacture and sale of the Fraudulent Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.   Documents to process and receive payment for the Fraudulent Vehicles by unsuspecting franchise dealers, including invoices and receipts;

m.   Payments to Bosch;

n.      Deposits of proceeds;

o.      SEC filings where GM has failed to disclose the scheme and has
continued to do so post the Volkswagen scandal; and

p.      Other documents and things, including electronic communications.

334.    The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

335.    The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, GM made misrepresentations about the Fraudulent Vehicles on GM websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

336.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

337.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Fraudulent Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Fraudulent Vehicles were "clean" diesel cars or vehicles with a "remarkable reduction in emission."

338.    Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books

and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

339.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

340.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

341.   To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Fraudulent Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Fraudulent Vehicles.

342.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing,

marketing, testing, and/or selling the Fraudulent Vehicles (and the defect devices contained therein).

343.     Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically, complete secrecy about the defeat devices in the Fraudulent Vehicles.

344.     The RICO Defendants knew and intended that government regulators, as well as Plaintiffs, would rely on the material misrepresentations and omissions made by them about the Fraudulent Vehicles. The RICO Defendants knew and intended that Plaintiffs would incur costs and damages as a result. As fully alleged herein, Plaintiffs relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that: (1) they purchased hundreds of thousands of vehicles that never should have been introduced into the U.S. stream of commerce and whose worth is far less than was paid. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise, GM could not have obtained valid COCs and EOs to sell the Fraudulent Vehicles.

345.     The RICO Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs were harmed as a result of the RICO Defendants' intentional conduct. Plaintiffs, regulators, and consumers, among others, relied on the RICO Defendants' material misrepresentations and omissions.

346.     As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and obtaining significant monies and revenues from them and through them while providing Fraudulent Vehicles

worth significantly less than the invoice price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

347.   The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and consumers. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Clean Diesel Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' funds, artificially inflating the brand and dealership goodwill values, and avoiding the expenses associated with remediating the Fraudulent Vehicles.

348.   During the design, manufacture, testing, marketing, and sale of the Fraudulent Vehicles, the RICO Defendants shared technical, marketing, and financial information that plainly revealed the emissions control systems in the Fraudulent Vehicles as the ineffective, illegal, and fraudulent piece of technology they were and are. Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Fraudulent Vehicles as "clean," "environmentally friendly," and "fuel efficient."

349.   By reason of and as a result of the conduct of the RICO Defendants, and in particular its pattern of racketeering activity, Plaintiffs have been injured in multiple ways, including but not limited to:

   a.   Overpayment for Fraudulent Vehicles, in that Plaintiffs at the time of purchase believed they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that did not meet these standards and were worth less than what was paid;

b.      The value of the Fraudulent Vehicles has diminished, thus reducing their sale and

resale value, and has resulted in a loss of property for Plaintiffs; and

c.      Plaintiffs have been wrongfully deprived of their property in that the price for their

vehicles was artificially inflated by deliberate acts of false statements, omissions

and concealment and by Defendants' acts of racketeering.

350.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and

proximately caused injuries and damages to Plaintiffs, and Plaintiffs are entitled to bring this action

for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each of the RICO Defendants knew, understood,

and intended for Plaintiffs to acquire the Fraudulent Vehicles, and knew, understood, and foresaw

that revelation of the truth would injure Plaintiff.

## STATE LAW CLAIMS

## INDIANA

351.    Plaintiffs Lowranzo Hackett, Mike Hale, Ryan Hale, Larry Higgins, Mary Higgins,

Kyle Hines, Paul Holden, Tony Holden, TWH Concrete, Inc., Paul Homburg, Steven Hoover,

Sheri Hoover, Samuel Hull, Thomas Jackson, Glenda Jackson, Richard Kaehler, Phillip Kitts,

Wilbert Lavely, Kristopher Lowe, Yvonne Lowe, Jeff Luken, Stephen Mays, Christian McElwee,

Hunter Mindek, Jason Mohlke, Terry Mohlke, Lorene Mohlke, Jeffrey Moore, Paul Morris, Glen

Neely, Michael Palmer, Gloria Palmer, Michael Redd, Matthew Robbins, Terry Robinson, Marilyn

Robinson, William Rundle, Robert Sandberg, Steve Schemerhorn, Brent Schuck, Kyle Schuck,

Kelly Shanley, Heidi Shaw, Matthew Spencer, Michael Summers, Brad Wagner, Chris Wehmer,

Gary Whittemore, Kelly Whittemore, Martha Wilkens, Rich Wine, Darren Wireman, Steve Wray,

June Wray, John Yoder, and Joyce Yoder (collectively, the "Indiana Plaintiffs") acquired their Fraudulent Vehicles while in the State of Indiana.

## INDIANA COUNT 1- FRAUD BY CONCEALMENT
### (On behalf of the Indiana Plaintiffs)

352.    The Indiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

353.    GM committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from consumers.

354.    GM concealed and suppressed material facts concerning the quality and characteristics of its vehicles and the emissions system in the Fraudulent Vehicles.

355.    GM intentionally concealed that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions, that the Fraudulent Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of GM's advertising campaign, and emitted high levels of pollutants such as NOx, or GM acted with reckless disregard for the truth and denied the Indiana Plaintiffs information that was highly relevant to their purchasing decision.

356.    GM further affirmatively misrepresented to the Indiana Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Fraudulent Vehicles it was selling had no significant defects, were Earth-friendly and low emission vehicles, and would perform and operate properly when driven in normal usage.  The Indiana Plaintiffs reasonably relied on GM's material representations that the Fraudulent Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

357.    GM knew these representations were false when made.

358.    The Fraudulent Vehicles purchased or leased by the Indiana Plaintiffs were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of GM's advertising campaign, and unreliable because the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions.  A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated pollution during normal operation.

359.    As alleged in this Complaint, at all relevant times, GM has held out the Fraudulent Vehicles to be reduced emissions. GM disclosed certain details about the GM Clean Diesel engine, but nonetheless, GM intentionally failed to disclose the important facts that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions and that the Fraudulent Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, and emitted high levels of pollutants, making other disclosures about the emission system deceptive.

360.    GM had a duty to disclose that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions and that these Fraudulent Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, that the emissions far exceeded those expected by a reasonable consumer, and were unreliable.

361.    GM had a duty to disclose the aforementioned facts because the truth about the defective emissions controls and GM's manipulations of those controls, high emissions, and the

"Defeat Device" was known only to GM; the Indiana Plaintiffs did not know of these facts and GM actively concealed these facts from the Indiana Plaintiffs. The Indiana Plaintiffs had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, the Indiana Plaintiffs did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive the Indiana Plaintiffs by concealing the true facts about the Fraudulent Vehicles.

362.    GM also had a duty to disclose the aforementioned facts because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, its actual philosophy with respect to emissions, and its actual practices with respect to the vehicles at issue. GM made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions. Having volunteered to provide information to the Indiana Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Fraudulent Vehicles purchased or leased by the Indiana Plaintiffs. Whether a manufacturer's products pollute and whether that manufacturer tells the truth with respect to such pollution are material concerns to a consumer. GM represented to the Indiana Plaintiffs that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

363.    GM further had a duty to disclose the emissions defect, defective design of the emissions controls, and violations with respect to the Fraudulent Vehicles because details of the true facts were known and/or accessible only to GM, because GM had exclusive knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by the Indiana Plaintiffs.   GM employed an artifice or trick to conceal the true nature of the Fraudulent Vehicles because it used the Defeat Device to deceive consumers into believing that the Fraudulent Vehicles were low emissions vehicles.  GM used the Defeat Device to conceal the defective nature of the Fraudulent Vehicles and their true characteristics.  The Defeat Device prevented consumers from making further independent inquiry into the true nature of the vehicles because it made the Fraudulent Vehicles appear to be performing as represented when in fact they were not.

364.    GM also concealed and suppressed material facts concerning what is evidently the true culture of GM—one characterized by an emphasis on profits and sales above the environment and reduced emissions. It also emphasized profits and sales above the trust that the Indiana Plaintiffs placed in its representations. Consumers buy diesel cars from GM because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Fraudulent Vehicles are doing.

365.    GM's false representations were material to consumers, because they concerned the quality of the Fraudulent Vehicles and also because the representations played a significant role in the value of the vehicles. As GM well knew, its customers, including the Indiana Plaintiffs highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

366.    GM actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel

vehicles, which perception would hurt the brand's image and cost GM money, and it did so at the expense of the Indiana Plaintiffs.

367.    When confronted about the defective nature of the Fraudulent Vehicles by consumers, GM denied the existence of the defect.  GM has still not made full and adequate disclosures, and continues to defraud the Indiana Plaintiffs by concealing material information regarding the emissions qualities of its referenced vehicles

368.    The Indiana Plaintiffs reasonably relied upon GM's representations, omissions, and deception.

369.    The Indiana Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have acquired purportedly reduced emissions diesel cars manufactured by GM, and/or would not have continued to drive their heavily Fraudulent Vehicles, or would have taken other affirmative steps in light of the information concealed from them. The Indiana Plaintiffs' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public or the Indiana Plaintiffs.

370.    Because of the concealment and/or suppression of the facts, the Indiana Plaintiffs have sustained damage because they acquired vehicles that are diminished in value as a result of GM's concealment of the true quality and quantity of those vehicles' emissions and GM's failure to timely disclose the defect or defective design of the GM Clean Diesel engine system, the actual emissions qualities and quantities of GM-branded vehicles, and the serious issues engendered by GM's corporate policies. Had the Indiana Plaintiffs been aware of the true emissions facts with regard to the Fraudulent Vehicles, and the Company's disregard for the truth, the Indiana Plaintiffs would have paid less for their vehicles or would not have acquired them at all.

371.    The value of the Indiana Plaintiffs' vehicles has diminished as a result of GM's fraudulent concealment of the defective emissions controls of the Fraudulent Vehicles and of the high emissions of the Fraudulent Vehicles, all of which has greatly tarnished the GM brand name attached to the Indiana Plaintiffs' vehicles and made any reasonable consumer reluctant to purchase any of the Fraudulent Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

372.    Accordingly, GM is liable to the Indiana Plaintiffs for damages in an amount to be proven at trial.

373.    Defendant is 'liable to the Indiana Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial. Defendant's actions amounted to willful and wanton misconduct.  Further Defendant acted maliciously, fraudulently, oppressively, and with gross negligence.  Defendant's conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial.

### INDIANA COUNT 2
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

374.    The Indiana Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

375.    Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval,

status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Defendants' aforementioned conduct violated this statute.

376.    Each Defendant is a "person" within the meaning of IND. CODE § 25- 5-0.5- 2(a)(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

377.    The Indiana Plaintiffs' vehicle purchases are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

378.    The Indiana Plaintiffs have complied with all applicable, pre-suit notice letter provisions of the Indiana DSCA.

379.    Pursuant to IND. CODE § 24-5-0.5-4, the Indiana Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for Defendants' willfully deceptive acts.  The Indiana Plaintiffs further seek reasonable attorney fees and costs per Ind. Code § 24-5-0.5-4.  The Indiana Plaintiffs

also seek punitive damages based on the outrageousness and recklessness of each Defendant's conduct.

## OREGON

380.    Plaintiffs Jesus Andrade, Bruce Becking, Linda Becking, Matthew Beckman, Travis Bowen, Brian Brewer, Carrie Brewer, Keira Coburn-Spry, Robert Cour, Christine Cour, John Deshazer, Kirk Dority, Isaac Duling, Brian Engel, Rashell Engel, Luke Fortier, Carl Gage, Gloria Gage, Joseph Garrott, Randy Gonzales, Michael Grant, Ryan Groom, Jeff Heath, James Hekker, Paul Hockersmith, Kenneth Johnson, Katie Johnson, Peter Kerbs, Kay Kerbs, Jeff Kershaw, Eric Klopman, Michael Leary, Keith Leete, David Lewis, Robert Mager, Chinh Nguyen, Leslie Nguyen, Cody Owens, James Pallo, Melissa Pennington, Brad Peters, Jonathan Phelan, Jeremiah Platt, Darrick Ritter, Brandon Roberts, Alan Rockwood, Dawn Sayles, Randy Smith, Viktor Sorokin, Brandon Spry, Joseph Steinbruck, Julie Steinbruck, Shaun Taylor, Lewis Titus, Neila Vanaken, Steve Woodward, and Richard Zeegers (collectively, the "Oregon Plaintiffs") acquired their Fraudulent Vehicles while in the State of Oregon.

### OREGON COUNT 1- FRAUD BY CONCEALMENT
### (On behalf of the Oregon Plaintiffs)

381.    The Oregon Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

382.    GM committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from consumers.

383.    GM concealed and suppressed material facts concerning the quality and characteristics of its vehicles and the emissions system in the Fraudulent Vehicles.

384.    GM intentionally concealed that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions, that the Fraudulent Vehicles had

defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of GM's advertising campaign, and emitted high levels of pollutants such as NOx, or GM acted with reckless disregard for the truth and denied the Oregon Plaintiffs information that was highly relevant to their purchasing decision.

385.    GM further affirmatively misrepresented to the Oregon Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Fraudulent Vehicles it was selling had no significant defects, were Earth-friendly and low emission vehicles, and would perform and operate properly when driven in normal usage.  The Oregon Plaintiffs reasonably relied on GM's material representations that the Fraudulent Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

386.    GM knew these representations were false when made.

387.    The Fraudulent Vehicles purchased or leased by the Oregon Plaintiffs were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of GM's advertising campaign, and unreliable because the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions.  A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated pollution during normal operation.

388.    As alleged in this Complaint, at all relevant times, GM has held out the Fraudulent Vehicles to be reduced emissions. GM disclosed certain details about the GM Clean Diesel engine,

but nonetheless, GM intentionally failed to disclose the important facts that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions and that the Fraudulent Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, and emitted high levels of pollutants, making other disclosures about the emission system deceptive.

389.    GM had a duty to disclose that the NOx reduction system in the Fraudulent Vehicles turns off or is limited during normal driving conditions and that these Fraudulent Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, that the emissions far exceeded those expected by a reasonable consumer, and were unreliable.

390.    GM had a duty to disclose the aforementioned facts because the truth about the defective emissions controls and GM's manipulations of those controls, high emissions, and the "Defeat Device" was known only to GM; the Oregon Plaintiffs did not know of these facts and GM actively concealed these facts from the Oregon Plaintiffs.  The Oregon Plaintiffs had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, the Oregon Plaintiffs did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive the Oregon Plaintiffs by concealing the true facts about the Fraudulent Vehicles.

391.    GM also had a duty to disclose the aforementioned facts because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, its actual philosophy with respect to emissions, and its actual practices

with respect to the vehicles at issue. GM made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions. Having volunteered to provide information to the Oregon Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Fraudulent Vehicles purchased or leased by the Oregon Plaintiffs. Whether a manufacturer's products pollute and whether that manufacturer tells the truth with respect to such pollution are material concerns to a consumer. GM represented to the Oregon Plaintiffs that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

392.    GM further had a duty to disclose the emissions defect, defective design of the emissions controls, and violations with respect to the Fraudulent Vehicles because details of the true facts were known and/or accessible only to GM, because GM had exclusive knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by the Oregon Plaintiffs.   GM employed an artifice or trick to conceal the true nature of the Fraudulent Vehicles because it used the Defeat Device to deceive consumers into believing that the Fraudulent Vehicles were low emissions vehicles.  GM used the Defeat Device to conceal the defective nature of the Fraudulent Vehicles and their true characteristics.  The Defeat Device prevented consumers from making further independent inquiry into the true nature of the vehicles because it made the Fraudulent Vehicles appear to be performing as represented when in fact they were not.

393.    GM also concealed and suppressed material facts concerning what is evidently the true culture of GM—one characterized by an emphasis on profits and sales above the environment

and reduced emissions. It also emphasized profits and sales above the trust that the Oregon Plaintiffs placed in its representations. Consumers buy diesel cars from GM because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Fraudulent Vehicles are doing.

394.     GM's false representations were material to consumers, because they concerned the quality of the Fraudulent Vehicles and also because the representations played a significant role in the value of the vehicles. As GM well knew, its customers, including the Oregon Plaintiffs highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

395.     GM actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost GM money, and it did so at the expense of the Oregon Plaintiffs.

396.     When confronted about the defective nature of the Fraudulent Vehicles by consumers, GM denied the existence of the defect.  GM has still not made full and adequate disclosures, and continues to defraud the Oregon Plaintiffs by concealing material information regarding the emissions qualities of its referenced vehicles

397.     The Oregon Plaintiffs reasonably relied upon GM's representations, omissions, and deception.

398.     The Oregon Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have acquired purportedly reduced emissions diesel cars manufactured by GM, and/or would not have continued to drive their heavily Fraudulent Vehicles, or would have

taken other affirmative steps in light of the information concealed from them. The Oregon Plaintiffs' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public or the Oregon Plaintiffs.

399.    Because of the concealment and/or suppression of the facts, the Oregon Plaintiffs have sustained damage because they acquired vehicles that are diminished in value as a result of GM's concealment of the true quality and quantity of those vehicles' emissions and GM's failure to timely disclose the defect or defective design of the GM Clean Diesel engine system, the actual emissions qualities and quantities of GM-branded vehicles, and the serious issues engendered by GM's corporate policies. Had the Oregon Plaintiffs been aware of the true emissions facts with regard to the Fraudulent Vehicles, and the Company's disregard for the truth, the Oregon Plaintiffs would have paid less for their vehicles or would not have acquired them at all.

400.    The value of the Oregon Plaintiffs' vehicles has diminished as a result of GM's fraudulent concealment of the defective emissions controls of the Fraudulent Vehicles and of the high emissions of the Fraudulent Vehicles, all of which has greatly tarnished the GM brand name attached to the Oregon Plaintiffs' vehicles and made any reasonable consumer reluctant to purchase any of the Fraudulent Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

401.    Accordingly, GM is liable to the Oregon Plaintiffs for damages in an amount to be proven at trial.

402.    Defendant is liable to the Oregon Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Oregon Plaintiffs sue Defendant.   Defendant's conduct has shown a reckless and outrageous

indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety, and welfare of others.  Further, Defendant has acted with malice.  Defendant's conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Oregon Plaintiffs sue Defendant.

## OREGON COUNT 2
## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
## (OR. REV. STAT. § 646.605 *ET SEQ.*)

403.     The Oregon Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

404.     The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business, doing any of the following: representing that goods have characteristics uses, benefits, or qualities that they do not have; representing that goods are of a particular standard or quality if they are of another; advertising goods or services with intent not to provide them as advertised; and engaging in any other unfair or deceptive conduct in trade or commerce. OR. REV. STAT. § 646.608(1). Defendants' aforementioned conduct violated this statute.

405.     Each Defendant is a person within the meaning of OR. REV. STAT. § 646.605(4).

406.     Each Fraudulent Vehicle is a "good" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

407.     The Oregon Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1) plus attorneys' fees and costs per Or. Rev. Stat. § 646.638(3) plus any other just and proper relief available under the Oregon UTPA.  The Oregon Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## REQUEST FOR RELIEF

A.      Restitution, including at the election of Plaintiffs, recovery of the purchase price

of their Fraudulent Vehicles, or the overpayment or diminution in value of their

Fraudulent Vehicles;

B.      Damages, including punitive damages, costs, and disgorgement in an amount to

be determined at trial;

C.      An order requiring Defendants to pay both pre- and post-judgment interest on any

amounts awarded;

D.      An award of costs and attorneys' fees; and

E.      Such other or further relief as may be appropriate.


DATED:  May 6, 2019.

Respectfully submitted,


/s/ Charles Miller
Charles Miller
charles@hop-law.com
Eric D. Pearson
eric@hop-law.com
Michael E. Heygood
michael@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002